SIDERS et al., Appellants and Cross–Appellees,

v.

REYNOLDSBURG SCHOOL DISTRICT, Appellee and Cross–Appellant.

[Cite as *Siders v. Reynoldsburg School Dist.* (1994), 99 Ohio App.3d 173.]

Court of Appeals of Ohio,
Franklin County.

No. 93APE10–1461.

Decided Dec. 13, 1994.

174

*Matan & Smith, James D. Colner, Robert D. Noble* and *Spencer Benedict,* for appellants and cross-appellees Lee Eric Siders and Crystal Root.

*Crabbe, Brown, Jones, Potts & Schmidt, John C. Albert* and *William H. Jones,* for appellee and cross-appellant Reynoldsburg School District.

DESHLER, Judge.

This is an appeal by plaintiffs, Lee Eric Siders and Crystal Root, from a judgment of the Franklin County Court of Common Pleas, following a jury trial in which the jury returned verdicts finding defendant, Reynoldsburg School District, fifty-one percent negligent, and plaintiff Siders forty-nine percent negligent, for injuries sustained by Siders when the bicycle he was riding was involved in a collision with a Reynoldsburg city school bus.

The accident occurred on April 21, 1991. Siders was thirteen years of age at the time. On that date, the driver of the school bus, Mary Morris, was operating a bus northbound on Lancaster Avenue at approximately 3:45 p.m. Siders was also travelling northbound on Lancaster Avenue, ahead of the bus.

Morris testified that she was driving at the posted speed limit of thirty-five m.p.h. Morris first observed Siders riding his bicycle near Sabre Avenue. According to Morris, Siders was "riding his bicycle along the right side of the

road" about "a block or so" in front of the bus. Morris approached to within fifteen or twenty feet of the rider before she attempted to pass him. As Morris was approaching Siders, she slowed down to let a car in the southbound lane go by the bus "so there would be no problem in my passing him." After the southbound car passed, Morris attempted to pass Siders. Morris noted that the tire of the bus may have touched the double yellow line of the road, but the tire did not go over the line. Although Morris stated that she was looking for Siders in the bus mirrors as she was passing, she did not see the impact. She heard, however, the impact of the bus with the bicycle. The portion of the bus which collided with the bicycle was "right behind the front wheel."

Glenna Stemen, a teacher with the Reynoldsburg city schools, was called as a witness by plaintiffs. Stemen was driving northbound on Lancaster Avenue at the time of the accident, approximately fifty yards behind the bus. According to Stemen, Siders was proceeding north, pedalling in a fast manner, "in the lane * * * three feet from the side of the road."

Stemen observed the bus move to the left. As the bus was moving to the left, there were vehicles travelling southbound in the opposite direction on Lancaster Avenue. It appeared to Stemen that the bicycle was "beside the bus." Stemen did not observe the bus move back to the right prior to impact. She thought that the impact of the bus and the bicycle occurred along the back right side of the bus. Upon impact, the bicycle and rider fell away from the bus.

Patricia Knight was also called as a witness by plaintiffs. At the time of the incident, Knight was travelling south on Lancaster Avenue when she first observed a bicyclist "on the right side of the lane, heading north." According to Knight, the bicyclist came out onto the road from a driveway. She also observed the school bus travelling in the northbound lane. Knight indicated that the bicyclist "looked over his left shoulder and saw the bus coming, looked like he was trying to beat it." As Knight approached the bicycle and bus, she did not see the bus go onto or over the double yellow lines. Knight's vehicle passed the bus and bicycle just as the bus was attempting to pass the bicycle in the opposite direction. Knight looked in her rear-view mirror and noticed that the bus had stopped. Knight testified that during the entire time that she saw the bicyclist proceeding northbound, he was on the roadway.

William Miller, a paramedic with the Truro Township Fire Department, testified that he was dispatched to the accident scene shortly after the incident. When he arrived at the scene, he observed that the injured boy was suffering from a compound fracture of the tibia and fibula. Miller testified that he heard the boy tell one of the paramedics at the scene, "I tried to beat the bus and didn't make it." A helicopter arrived at the scene and transported the victim to the hospital.

Siders testified on his own behalf. He gave the following testimony regarding the accident on April 21, 1991. On that date, he was riding his bicycle to his friend's house after school. Siders was travelling along Lancaster Avenue, "on the berm of the road." Siders looked back and noticed the bus approaching; at that point, his thought was "to speed up to get away from [the bus]." He began to pedal faster. Regarding the collision, Siders stated that:

" * * * [S]he was trying to go around me. And I seen her front left tire go over the double yellow line. And when she was coming back, she caught my back tire. The next thing I know I'm lying on the ground in the back."

Kevin Morgan testified on behalf of the defendant. Morgan was travelling on Lancaster Avenue on the day of the incident. Morgan observed the bus approaching him; he then noticed a boy on a bicycle travelling "towards the berm." Morgan noticed the bicycle rider begin to pedal faster as the bus came closer. Morgan testified that:

"He [Siders] started to come up further in front of the bus towards the front of the bus. And just, I don't know just that quick, after he got past the bus, it seemed to me that he tried to pass in front of the bus, turn in front of the bus."

Charles Brooks, a paramedic with the Truro Township Fire Department, responded to the accident scene. While attending to Siders at the accident site, Brooks asked Siders what had happened. Siders told him that "I tried to beat the school bus across the street."

The case was tried before a jury beginning on May 13, 1993.[1] Following deliberations, the jury returned verdicts in favor of plaintiff Crystal Root, the mother of Siders, in the amount of $129,000, and in favor of Siders in the amount of $21,000. The jury returned interrogatories finding Siders forty-nine percent negligent for his injuries and defendant fifty-one percent negligent. Jury interrogatories also indicated that the award of $21,000 to Siders was for future economic loss, i.e., future medical costs, and that the award of $129,000 in favor of Root was for past damages.

The trial court filed a judgment entry on October 7, 1993. Pursuant to R.C. 2744.05(B), the court determined that benefits received by plaintiffs for injury or loss from policies of insurance or any other source totalled $125,870.92. The court then calculated an offset of all collateral source benefits received by plaintiffs and entered judgment in favor of Crystal Root for zero amount, and

---

1. Plaintiffs' complaint named as defendants the Reynoldsburg School District, the Reynoldsburg Board of Education, Dr. Richard Ross, the superintendent of the Reynoldsburg Board of Education, and Mary Morris, the bus driver involved in the accident. The record indicates that, prior to trial, plaintiffs voluntarily dismissed Morris and Ross in their individual capacities, and the case proceeded to trial against the Reynoldsburg School District.

judgment in favor of plaintiff Siders in the amount of $10,710. The court also assessed court costs against defendant in the amount of $4,434.97.

On appeal, plaintiff sets forth eight assignments of error for review:

"1. The trial court failed to properly instruct the jury of defendants-appellees' duty to maintain an assured-clear-distance-ahead.

"2. The trial court erred in its instruction defining 'roadway.'

"3. The trial court improperly instructed the jury on the meaning of negligence per se, in general, and further, the trial court failed to instruct the jury on several statutory violations committed by defendant-appellee constituting negligence per se.

"4. The trial court erred by failing to instruct the jury that defendant-appellee failed to satisfy its duty to look.

"5. The trial court failed to properly instruct the jury regarding plaintiffs-appellants' damages.

"6. The trial court erred by refusing the admission of evidence, testimonial and documentary, probative and relevant to defendant-appellee's duty of care and breach of its duty.

"7. The judgment of the jury in favor of appellants in the amount of $150,000.00 is inadequate and contrary to law.

"8. The jury's verdict is against the manifest weight of the evidence."

Defendant has filed a conditional cross-appeal, and asserts the following five assignments of error:

"I. The trial court erred in declaring R.C. 2744.05(C) unconstitutional.

"II. The trial court erred in excluding from use an impeachment video tape.

"III. The trial court erred in not finding plaintiff negligent as a matter of law.

"IV. The trial court erred in denying political subdivision immunity.

"V. The trial court erred in granting appellants court costs in their entirety."

Under the first assignment of error, plaintiffs contend that the trial court erred in failing to instruct the jury regarding the duty of the bus driver to maintain an assured clear distance ahead.

R.C. 4511.21 provides in part that:

"(A) * * * [N]o person shall drive any motor vehicle, trackless trolley, or streetcar in and upon any street or highway at a greater speed than will permit him to bring it to a stop within the assured clear distance ahead. * * *"

In *Blair v. Goff–Kirby Co.* (1976), 49 Ohio St.2d 5, 7, 3 O.O.3d 4, 5, 358 N.E.2d 634, 636, the Ohio Supreme Court held that:

" * * * Violation of [R.C. 4511.21] * * * and a finding of negligence *per se* depends on whether there is evidence that the driver collided with an object which (1) was ahead of him in his path of travel, (2) was stationary or moving in the same direction as the driver, (3) did not suddenly appear in the driver's path, and (4) was reasonably discernible. * * * " (Citation omitted.)

The court in *Pallini v. Dankowski* (1969), 17 Ohio St.2d 51, 56, 46 O.O.2d 267, 269–270, 245 N.E.2d 353, 357, gave the following meaning to the words "ahead" and "lane," holding that:

"The word 'ahead,' as it appears in Section 4511.21 of the Revised Code, and the word 'lane,' as it appears in our decisions on the question, mean to the front of, and within the directional line of travel of, a motorist whose conduct is sought to be brought within the rules's application."

In *DiFederico v. Reed* (1969), 21 Ohio App.2d 137, 149, 50 O.O.2d 240, 247–248, 255 N.E.2d 869, 877, the court noted under what circumstances there could be relief from the assured-clear-distance-ahead rule, stating:

" * * * Relief from the rule comes when the assured clear distance ahead is suddenly cut down. Some times the courts speak of sudden emergence, or simply of an emergency. * * *

"*Hemmelgarn v. Bailey* ( [App.] 1950), 61 Ohio Law Abs. 179 [104 N.E.2d 50], supplies the basic rule that assured clear distance ahead does not apply 'when a discernible object obstructing the path or line of travel suddenly enters within the clear distance ahead * * *.' *Elfers v. Bright* (1958), 108 Ohio App. 495 [9 O.O.2d 473, 162 N.E.2d 535], supplies the corollary that an assured-clear-distance-ahead rule violation may be excused where compliance became impossible and the driver was without fault. The burden is on the operator to sustain the excuse and the question is for the jury."

■ In the present case, the parties presented conflicting theories at trial regarding the collision. Briefly, plaintiffs' theory is summarized as follows: the bus driver observed Siders on his bicycle, travelling north on Lancaster Avenue, in the same direction as the bus; Siders was at all times riding his bicycle on the far right side of the northbound lane of Lancaster Avenue, on the edge of the pavement; in order to pass the bicycle rider, it was necessary for the bus driver to go left of center, across the double line; as the bus driver steered to the left to get around the bike, there were vehicles approaching the bus in the opposite (southbound) direction; as the bus driver maneuvered the bus back into the northbound lane, the right side of the front bumper of the bus came in contact with the rear tire of the bicycle.

Defendant's theory of the accident was that Siders, after observing the bus approaching from the rear, started to speed up in an effort to get away from the bus and prevent the bus from passing him. As the bus was approaching the bicycle, Siders turned left into the path of the bus.

The evidence indicates that the bus driver, Morris, first observed Siders travelling northbound approximately "a block or so" ahead of the bus. There was varying testimony concerning the location of the bicycle in relation to the roadway. According to Morris, Siders was travelling on "the right edge of the road." Glenna Stemen, an eyewitness who was driving northbound on Lancaster Avenue approximately fifty yards behind the bus, testified that Siders was pedalling the bike "in the lane * * * three feet from the side of the road." Patricia Knight, who was operating her vehicle southbound on Lancaster Avenue at the time of the accident, stated that Siders was "on the right side of the lane, heading north." She further testified that during the entire time that she observed the bicycle rider proceeding northbound, he was on the roadway. According to Siders' own testimony, he was pedalling the bicycle "on the berm of the road." Another witness, Kevin Morgan, testified that Siders was travelling "towards the berm."

There was also conflicting evidence regarding the issue of whether the bus maneuvered into the path of the bike or whether Siders suddenly turned left into the side of the bus. Morgan testified that it appeared that the boy tried to pass in front of the bus. According to Siders, the bus crossed the yellow line and then came back, striking him as the bus was maneuvering back into the northbound lane.

Whenever conflicting evidence is presented regarding any of the elements of a violation of R.C. 4511.21(A), such evidence presents an issue for the jury. *Tomlinson v. Cincinnati* (1983), 4 Ohio St.3d 66, 69, 4 OBR 155, 157–158, 446 N.E.2d 454, 456–457. In *Blair, supra* 49 Ohio St.2d at 9, 3 O.O.3d at 6, 358 N.E.2d at 637, the court held that, "[e]specially in cases involving the assured-clear-distance statute, which, by definition, require evaluation of the conduct of the driver in light of the facts surrounding the collision, the judgment of a jury is more likely to achieve a fair result than is a judge-made rule of law."

Arguably, the fact that the evidence shows that the bus did not strike the bicycle from behind, but, instead, that the side of the bus collided with the rear tire of the bicycle, does not present what might be characterized as a classic assured-clear-distance situation. There was, however, conflicting evidence regarding whether the bike was travelling in the directional line of travel of the bus prior to the accident. By Siders's own account, he was riding on the berm. Other testimony, however, placed the rider either in the "lane" or on the "roadway." In light of evidence that the bike rider was discernible and, as at

least some of the testimony suggests, in the driver's directional line of travel, we believe that there was evidence to support an instruction on assured-clear-distance.

We note that, because plaintiffs' requested instruction on assured-clear-distance was not given by the trial court, the issue whether the defense of sudden emergence would be applicable was not raised. We have previously concluded that there was conflicting evidence regarding whether the bike suddenly turned into the path of the bus; thus, while not dispositive, we note that, in addition to the fact that the jury should have been instructed on the issue of assured-clear-distance, the record also contains evidence upon which defendant would have been entitled to a sudden emergence instruction, *i.e.*, if the jury found that Siders suddenly entered the path of the bus, thereby cutting down the driver's assured clear distance ahead, the doctrine of assured-clear-distance would not be applicable.

In sum, we find that plaintiffs presented evidence "from which reasonable minds might reach the conclusion sought by the instruction." *Feterle v. Huettner* (1971), 28 Ohio St.2d 54, 57 O.O.2d 213, 275 N.E.2d 340, syllabus. Because the requested instruction was a correct statement of the law and applicable to the evidence, we find that an instruction on assured-clear-distance was warranted, and that the failure to give such an instruction resulted in prejudicial error.

The first assignment of error is sustained.

Under the second assignment of error, plaintiffs argue that the trial court erred in its instruction to the jury defining the term "roadway." Plaintiffs assert that the trial court's instruction defined roadway to include only the portion of the paved surface between the white boundary lines of Lancaster Avenue. Plaintiffs argue in their brief that the evidence indicates that Siders operated his bicycle northbound "in the north bound lane, and/or on the white boundary line for the north bound lane, and/or on the paved portion of the roadway on the east side of the north bound boundary line." Plaintiffs maintain that the above areas all encompass the term "roadway"; thus, plaintiffs contend, the court's instruction unlawfully permitted the jury to consider that Siders forfeited his right of way by operating his bicycle to the right or eastern side of the white boundary line, and to further consider that Siders may have breached his duty of ordinary care by crossing the white boundary line without exercising ordinary care.

Pursuant to R.C. 4511.01(EE), roadway is defined as "that portion of a highway improved, designed, or ordinarily used for vehicular travel, except the berm or shoulder." The term "highway" is defined under R.C. 4511.01(BB) as "the entire width between the boundary lines of every way open to the use of the public as a thoroughfare for purposes of vehicular traffic." "Laned highway" is defined as "a

highway the roadway of which is divided into two or more clearly marked lanes for vehicle traffic." R.C. 4511.01(GG).

In the present case, the trial court gave the following instruction defining the terms "highway," "roadway," "laned highway," "berm" and "shoulder":

"The following definitions, ladies and gentlemen, concern our streets and highways. Streets and highways mean the entire width between the boundary lines of every way open to the use of the public as thoroughfares for the purpose of vehicular traffic.

"Roadway means that portion of the highway improved and designed or ordinarily used for vehicular travel except for the berm or shoulder.

"If a highway includes two or more separate roadways, the term roadway means any such roadway separately and not all such roadways collectively.

"Neither the court nor counsel can find a definition of the word shoulder or berm in the statute.

"Shoulder, in the most recent of The American Heritage Dictionary of the English Language pertaining to roadway is defined as follows: the edge or border running on each, either side of the roadway.

"The berm is defined as the shoulder of the road. Laned highway in the statutes now means the highway, the roadway of which is divided into two or more clearly marked lanes for vehicular traffic.

"The white lines on the side of the roads which has been discussed in this case, do not appear to have any specific definition within the traffic laws of the state of Ohio or the city of Reynoldsburg.

"The court does find, however, under the definition of intersection, the area embraced within the prolongation or connection of lateral curb lines or if none, then the lateral boundary lines of the roadway of the two highways which join one another at approximately right angles.

"These lateral boundary lines on the roadway would appear logically to be the white lines which we commonly see on the sides of our roadways within Ohio. Therefore, the sections to the right of those white lines would be the berm or shoulder.

"If a vehicle, which operates on the berm or shoulder of a roadway was parked on a berm or shoulder of a roadway, which intends to enter the roadway, it must do so with caution and that the operator must use ordinary care.

"If you find from all of the facts and circumstances in evidence that the bicycle in question was on the berm or shoulder of the roadway, and did in fact enter the

roadway, you may consider whether or not using the standards of care previously defined, that the operator of the bicycle exercised the proper standard of care."

In support of their positions, both plaintiffs and defendant cite *Sech v. Rogers* (1983), 6 Ohio St.3d 462, 6 OBR 515, 453 N.E.2d 705. Under the facts of *Sech*, the decedent, while working on a road crew, was struck in the chest by a piece of guardrail and killed. The guardrail was propelled into the air by a passing school bus. At issue was the trial court's instruction regarding the right of way. Appellant asserted, on appeal to the Ohio Supreme Court, that the trial court's amended instruction to the jury regarding the right of way was an incorrect statement of the law because "the definitions given of roadway and highway erroneously included the paved portion thereof, to the right of the white line." *Id.* at 464, 6 OBR at 517, 453 N.E.2d at 707. The court in *Sech* found no prejudicial error and affirmed.

In the present case, plaintiffs assert that, based upon the Ohio Supreme Court's affirmation of the trial court's instruction in *Sech*, one can equate the legislature's reference to "that portion of a highway improved, designed, or ordinarily used for vehicle travel" as meaning the paved portion of the highway.

Defendant, on the other hand, contends that the majority in *Sech* did not address the appropriate definition of the word berm, nor did it decide whether berm should include the paved area to the right of the white line which normally runs along the right side of the highway. We agree with defendant's contention that the majority opinion did not address the issue raised by plaintiffs in the instant action. In *Sech*, the court found the trial court's instruction to be a correct statement of the law because "it used the appropriate definitions set out in the Revised Code, for highway (R.C. 4511.01[BB] ); roadway (R.C. 4511.01[EE] ); laned highway (R.C. 4511.01[GG] ); and right of way (R.C. 4511.01[UU] )." *Id.*, 6 Ohio St.3d at 465, 6 OBR at 517, 453 N.E.2d at 708.

The *Sech* court further recognized that, while the trial court's amended instruction might have been erroneous, appellant could show no prejudicial error. The court stated that:

" * * * [T]here is no evidence at any point in this case that the curved guardrail, which struck Sech, was resting between the white line and the end of the pavement. Nor is there any evidence that appellee operated the bus on or over the white line. Accepting appellee's version of this accident, she never operated the bus to the right of the white line. Accepting appellant's version of this accident, the bus driver clearly drove outside the highway and roadway, as defined by statute, before hitting the curved guardrail which struck decedent.

"Appellant's version of the accident was clearly rejected by the jury in its answer to the first interrogatory concerning appellee's alleged negligence.

Hence, even if we assumed that the trial court's instruction was erroneous, there is no showing of prejudice here." *Id.* at 465, 6 OBR at 517–518, 453 N.E.2d at 708.

In *Sech,* the only discussion regarding the effect of the solid white line at the right edge of the highway, and its relationship to the applicable statutes, is found in the dissenting opinion. Specifically, the dissenting opinion stated:

" * * * The effect of the trial court's charge was that appellee could be operating her vehicle to the right of the solid white line delineating the right boundary of her lane of travel and still enjoy the benefit of the right of way over appellant's decedent, so long as her tires remained on the pavement, rather than gravel. * * *

"R.C. 4511.01(EE) defines 'roadway,' as follows: ' * * * that portion of a highway improved, designed, or ordinarily used for vehicular travel, except the berm or shoulder. * * * '

"R.C. 4511.01(GG) states: ' "Laned highway" means a highway the roadway of which is divided into two or more clearly marked lanes for vehicular traffic.'

"R.C. 4511.33 provides that:

" 'Whenever any roadway has been divided into two or more clearly marked lanes for traffic * * * the following rules apply:

" '(A) A vehicle * * * shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety.'

"*The purpose of the solid white line near the right edge of the paved portion of the highway is to designate the portion of the highway designed for vehicular travel.*" (Emphasis added.) *Id.,* 6 Ohio St.3d at 467–468, 6 OBR at 519–520, 453 N.E.2d at 710 (C. Brown, J., dissenting.)

We further note that in this court's decision in *Sech v. Rogers* (Aug. 24, 1982), Franklin App. No. 81AP–418, unreported, 1982 WL 4367, the majority based its affirmance upon the fact that the instructions were not sufficiently confusing or ambiguous to mislead the jury. The majority further noted that there was no evidence that the guardrail was resting between the white line and the end of the pavement.

A dissenting opinion was filed which, similar to the dissent in the Supreme Court's decision, discussed the purpose of the solid white line in relationship to the applicable statutes. This court's dissent stated in pertinent part:

"Clearly, the purpose of the solid white line near the right edge of the paved portion of the highway is designed to delineate the extent of the roadway in that

it is intended to delineate which portion of the highway is designed for vehicular travel. In other words, the solid white is intended to be the dividing line between the roadway and the berm or shoulder. * * * There is a distinct difference between boundaries of a roadway and boundaries of the highway. The highway includes the berm and shoulder, as well as the roadway and any unimproved portion of the right-of-way being defined by R.C. 4511.01(BB) as being, 'the entire width between the boundary lines of every way open to the use of the public as a thoroughfare for purposes of vehicular travel.' The majority confuses the definition of 'highway' with that of 'roadway' * * *." *Id.* (Whiteside, J. dissenting.)

■ We find the analysis employed in the dissenting opinions, which specifically addresses the issue raised in the instant case, to be well reasoned and persuasive. Accepting the view that the purpose of the solid white line at the edge of the roadway delineates the portion of the highway designed for vehicular travel, we find that the court's instruction defining the berm or shoulder as the section to the right of the white lines, *i.e.*, to the right of the travelled portion of the highway designed for vehicular travel, was not erroneous. We further note that the definitions given by the court regarding the terms "roadway," "highway," and "laned highway" properly tracked the statutory language.

Plaintiffs' second assignment of error is overruled.

Under the third assignment of error, plaintiffs contend that the trial court erred in its instruction to the jury regarding the meaning of negligence *per se*. More specifically, plaintiffs argue that the court inserted equivocal language into the negligence *per se* portion of the instructions.

In *Becker v. Shaull* (1992), 62 Ohio St.3d 480, 482–483, 584 N.E.2d 684, 685–686, the Ohio Supreme Court noted that:

" * * * [T]he distinction between negligence and negligence *per se* ' * * * is the means and method of ascertainment. * * * ' *Swoboda v. Brown* (1935), 129 Ohio St. 512, 522, 2 O.O. 516, 521, 196 N.E. 274, 278. Thus, in considering a charge based upon negligence, the jury must make a determination whether the violation of the statute constitutes negligence based upon the facts, conditions and circumstances disclosed by the evidence. However, when considering a charge based upon negligence *per se,* which results from the violation of a specific requirement of law, the only factual determination for the jury is the commission or omission of the act prohibited or required."

■ In the instant case, the trial court instructed the jury regarding statutes and rules governing the operation of vehicles, including a school bus and bicycle. Plaintiffs cite to the following introductory and concluding instructions by the court regarding negligence *per se:*

"I have already now defined for you negligence and ordinary care, and indicated also that a person may be required by law to do or not to do something, and that that failure to follow the law could in and of itself be negligence.

" * * *

"All of the rules and regulations regarding the operation of each of the vehicles involved in this incident are such that their violation by either of the operators could constitute negligence.

"It is for you, of course, to determine what rules and regulations cover the factual situation as you find it, and what violations, if any, were committed by either or both of the operators.

"The mere fact that one of the operators violated one or more of the rules, although it may constitute negligence, does not necessarily indicate that that negligence proximately caused the collision in question."

Upon review, we agree with plaintiffs' contention that the language of the instruction was confusing, and suggested that a failure to comply with the rules or regulations at issue could constitute negligence rather than negligence *per se.* We further find that the misleading nature of the instructions may have resulted in an improper verdict. See, *e.g., Niermeyer v. Jenkins* (Apr. 15, 1982), Franklin App. No. 81AP–787, unreported, 1982 WL 4108 (where act of defendant constituted negligence *per se,* it was not within province of jury to deliberate on defendant's conduct as being negligent or not, and thus misleading instruction was prejudicial). On remand, the trial court must determine which statutes constitute negligence *per se,* and which statutes, if violated, may constitute negligence, and instruct accordingly.

Plaintiffs' third assignment of error is sustained.

We will address the fourth and fifth assignment of error in inverse order.

Under the fifth assignment of error, plaintiffs assert that the trial court erred in failing to instruct the jury regarding damages for the inability to perform usual functions. At trial, plaintiffs' counsel objected to the court's failure to give an instruction on inability to perform usual functions as set forth in the Ohio Supreme Court's decision in *Fantozzi v. Sandusky Cement Prod. Co.* (1992), 64 Ohio St.3d 601, 597 N.E.2d 474.

In *Fantozzi,* the court addressed the issue of damages for the "impairment of one's physical capacity to enjoy the amenities of life." *Id.* at 616, 597 N.E.2d at 485. Such damages entail compensation for the deprivation of one's ability to engage in activities and perform functions which were a part of, and provided pleasure to, an individual's life prior to his or her injury. *Id.* The *Fantozzi* court made clear that this type of damage is distinguishable from damages based upon

recognized categories of bodily pain and suffering. Damages for deprivation or impairment of life's usual activities "include loss of ability to play golf, dance, bowl, play musical instruments, engage in specific outdoor sports along with other activities." *Id.* at 617, 597 N.E.2d at 486. The court in *Fantozzi* held that:

"In the appropriate case, where there have been allegations of and evidence adduced on the plaintiff's inability to perform usual activities, occasioned by the injuries received, the trial court shall give these additional instructions to the jury:

" 'If you find from the greater weight of the evidence that, as a proximate cause of the injuries sustained, the plaintiff has suffered a permanent disability which is evidenced by way of the inability to perform the usual activities of life such as the basic mechanical body movements of walking, climbing stairs, feeding oneself, driving a car, etc., or by way of the inability to perform the plaintiff's usual specific activities which had given pleasure to this particular plaintiff, you may consider, and make a separate award for, such damages.

" 'Any amounts that you have determined will be awarded to the plaintiff for any element of damages shall not be considered again or added to any other element of damages. You shall be cautious in your consideration of the damages not to overlap or duplicate the amounts of your award which would result in double damages. For example, any amount of damages awarded to the plaintiff for pain and suffering must not be awarded again as an element of damages for the plaintiff's inability to perform usual activities. In like manner, any amount of damages awarded to the plaintiff for the inability to perform usual activities must not be considered again as an element of damages awarded for the plaintiff's pain and suffering, or any other element of damages.' " *Id.*, 64 Ohio St.3d at 618, 597 N.E.2d at 486–487.

■ In the present case, there was evidence presented by plaintiffs concerning Siders's loss of enjoyment resulting from the injuries he sustained. Siders's mother, Crystal Root, testified that prior to the accident, her son played basketball and football, rode his bike and participated in track and field at school. She also stated that he enjoyed helping around the house with household chores. Root testified that, subsequent to the accident, her son could not even help wash dishes because of swelling in his leg which occurs whenever he stands on his feet. for extended periods of time. Root further testified that her son could no longer mow the lawn. Siders testified that the injuries he received have prevented him from engaging in activities such as climbing trees, roller skating, wrestling, and participating in gym class, and that he is restricted in performing other sports activities he had previously enjoyed, such as basketball and hiking.

We find that the record supports sufficient evidence to have warranted plaintiffs' requested *Fantozzi* instruction. Accordingly, we conclude that the trial court erred in failing to charge the jury regarding damages for claimed loss of enjoyment of life.

Plaintiffs' fifth assignment of error is sustained.

■ Under the fourth assignment of error, plaintiffs argue that the trial court erred in instructing the jury on defendant's duty to look. In the present case, the record indicates that the trial court gave part of plaintiffs' requested instruction on the issue of the school bus driver's duty to look. Specifically, the court instructed the jury as follows:

"The parties are required to use ordinary care to discover and avoid danger. A person is negligent if he looks but does not see that which would have been seen by a reasonably careful person under the same or similar circumstances."

In addition to the above instruction, plaintiffs' proposed jury instruction No. 13 also requested an instruction that "[a] person is negligent when he does not continue to look if, under the circumstances, a reasonably * * * prudent person would have continued to look." The trial court did not give an instruction on a duty to continue to look.

We note that, during cross-examination, Morris, the bus driver, acknowledged that if she had used the "cross-over mirror" on the bus, she could have kept Siders in view the entire time that she tried to pass him. Morris further testified that "at the time * * * of the impact, I did not have him in my sight." We find that there was evidence in the record to support an instruction on a duty to continue to look. We further note that plaintiffs' requested instruction is part of the standard Ohio Jury Instructions on duty to look. Standing alone, we would not find that the trial court's failure to give the requested instruction warrants reversible error in this case. However, when considering the possible prejudicial effect of error regarding this instruction in conjunction with claims of error regarding other jury instructions previously addressed, we find the assignment of error to be well taken.

Accordingly, plaintiffs' fourth assignment of error is sustained.

Under the sixth assignment of error, plaintiffs contend that the trial court erred in failing to admit into evidence a school bus training manual. Plaintiffs argue that the trial court denied plaintiffs the opportunity to establish the standard of care for a reasonably careful school bus driver; further, it is argued, the court's limitation on plaintiffs' cross-examination of the school bus driver, regarding the training manual, constituted an abuse of discretion.

In general, the admission into evidence of exhibits is vested within the discretion of the trial court. *Yeager v. Riverside Methodist Hosp.* (1985), 24 Ohio App.3d 54, 56, 24 OBR 107, 109, 493 N.E.2d 559, 562. In the absence of a showing of an abuse of discretion, the determination of the trial court will not be reversed. *Id.*

■ We find no reversible error resulting from the trial court's failure to admit the school bus training manual. The record indicates that the trial court was concerned that admission of the training manual might be construed as conclusively setting forth a higher standard of care than Ohio law requires. Plaintiffs did not present evidence indicating that the manual represented a state-wide standard for school bus drivers, nor have they cited authority for the proposition that Ohio law requires a higher standard of care.

Even assuming, however, that a higher standard of care exists, and that the rules contained in the manual were admissible, we cannot conclude that exclusion of the manual was prejudicial. The record indicates that plaintiffs were permitted to extensively cross-examine the bus driver regarding rules set forth in the manual. Specifically, plaintiffs' counsel cross-examined Morris as follows:

"Q. * * * Aren't you trained, specifically trained as a school bus operator, to be a safe, defensive driver?

"A. That's right.

"Q. And I believe in the manual that we have in front of us, there is a whole section on defensive driving; is there not?

"A. There is.

"Q. I think for your reference, if you look at chapter five, beginning at page 5, dash one, you'll see the section on defensive driving.

"And in order to be a defensive driver, you have to make allowances for the lack of skill, knowledge and attitudes of other drivers, correct?

"A. That's true.

" * * *

"Q. You're also required to anticipate that other people will make mistakes and expect the unexpected long before it occurs?

"A. That's what it says.

" * * *

"Q. Now, getting back to the defensive driving manual. As part of the manual that's in front of you, they have a section there on page 5 there dealing with considerations that a bus must give because of the nature of a school bus, because of the additional size and weight of the bus determines that driver's

course of action. It requires more use of mirrors, the manual says; isn't that correct?

"A. That's very true.

"Q. And longer braking distances?

"A. Yes.

"Q. And it requires that you watch the road 12 seconds—

"A. —Ahead, yes."

The above testimony indicates that plaintiffs' counsel cross-examined the bus driver concerning specific portions of the manual dealing with rules that plaintiffs deemed relevant. Accordingly, we find any potential error resulting from the court's failure to admit the manual to be nonprejudicial.

Plaintiffs' sixth assignment of error is overruled.

Under the seventh assignment of error, plaintiffs contend that the judgment of the jury in the amount of $150,000 was inadequate and contrary to law.

As previously noted, the jury in the instant case returned verdicts in favor of plaintiff Crystal Root in the amount of $129,000, and in favor of plaintiff Siders in the amount of $21,000. The jury interrogatories indicate that the jury found Siders contributorily negligent and that his negligence constituted forty-nine percent of the negligence proximately causing his injuries. The jury determined that defendant's negligence was responsible for fifty-one percent of Siders's injuries. The interrogatories further indicate that the jury's total award of $150,000 was for compensatory damages, with $129,000 of that amount for Root's past damages and $21,000 for future damages to Siders.

Regarding future damages to Siders, the interrogatories indicate that the award of $21,000 for future economic losses was specifically for "[e]xpenditures, expenses, costs for future medical care or treatment, rehabilitation services or other care, treatment, services, products or accommodations."

Plaintiffs contend that, while the jury awarded plaintiffs damages for past and future medical expenses, the jury's failure to award Siders any future non-economic damages, despite the lack of contrary evidence by defendant, was against the manifest weight of the evidence.

In *Toledo Railways & Light Co. v. Mason* (1910), 81 Ohio St. 463, 91 N.E. 292, paragraph one of the syllabus, the court held:

"In an action to recover damages for personal injuries, a new trial may be granted on the ground of the inadequacy of the damages found by the jury, when it appears upon the facts proved that the jury must have omitted to take into

consideration some of the elements of damage properly involved in the plaintiff's claim."

We agree with plaintiffs' contention that the verdict, awarding no amount for noneconomic damages despite unrefuted evidence of pain and suffering, is not supported by the evidence. The evidence presented by plaintiff included the testimony of Dr. Raymond Kamus, an orthopedic surgeon, who treated plaintiff for his leg injuries. Dr. Kamus noted that plaintiff suffered an open fracture of the tibia, along with a loss of muscle tissue, fat tissue and skin tissue overlying the bone. The injury essentially rendered the leg bone open to the outside environment, requiring a tissue flap procedure. The patient experienced a significant amount of swelling as a result of the procedure. Siders also subsequently required a skin-grafting procedure to cover the exposed area of the bone.

Following surgery, Siders was admitted to a hospital emergency room because of leg pain. Dr. Kamus stated that the scars on Siders's leg were permanent; further, because of the free tissue flap procedure, the injured leg would not have the same contour as the uninjured leg. Dr. Kamus's evaluation indicated a twenty-eight percent impairment of the function of the lower leg extremity, secondary to the injury, which translated to an eleven percent impairment of the whole patient.

Dr. Robert Noble, a plastic and reconstructive surgeon, was consulted regarding the scarring Siders experienced as a result of the injuries. Siders had multiple scars of the chest, head and neck area and multiple scars of the lower leg, including a bulky flap of tissue placed on the lower leg to cover the exposed bone. Dr. Noble recommended that the patient wait a year or two before considering scar revision surgery. Noble also opined that Siders would need scar revision surgery and "debulking" work to reduce the size of the flap.

Dr. Terrence Davis, a specialist in pediatric-thoracic surgery, treated Siders for thoracic injuries at the time of the accident. Siders suffered a tear of his aorta, which Dr. Davis described as life-threatening at the time. Dr. Davis performed surgery to repair the tear. Following surgery, Siders experienced chest wall discomfort and pain.

Crystal Root, the mother of Siders, testified that her son complained of pain "all the time" for a couple of months following the accident. Root stated that her son also became discouraged about his physical appearance, and engaged in self-destructive behavior. Siders eventually had to be admitted to the psychiatric unit at Riverside Hospital for ten days.

The evidence of pain and suffering was not disputed, and thus the inadequacy of the award cannot be reconciled with the evidence. We find that the jury lost its way in deliberating on the issue of damages, and that the verdict regarding

the issue of noneconomic damages was against the manifest weight of the evidence.

Accordingly, plaintiffs' seventh assignment of error is sustained.

Plaintiffs' eighth assignment of error contends that the jury's verdict was against the manifest weight of the evidence. Plaintiffs essentially reiterate arguments raised under their previous assignments of error. Based upon our disposition of plaintiffs' first, third, fourth, fifth and seventh assignments of error, any alleged error under the eighth assignment of error is moot.

Accordingly, the eighth assignment of error is overruled.

We next address defendant's conditional assignments of error on cross-appeal. Under defendant's first assignment of error on cross-appeal, it is asserted that the trial court erred in declaring R.C. 2744.05(C) to be unconstitutional.

R.C. 2744.05(C)(1) places a limitation ($250,000) on the amount of noneconomic damages that can be awarded against a political subdivision. The statute provides in part:

"Notwithstanding any other provisions of the Revised Code or rules of a court to the contrary, in an action against a political subdivision to recover damages for injury, death, or loss to persons or property caused by an act or omission in connection with a governmental proprietary function:

" * * *

"(C)(1) There shall not be any limitation on compensatory damages that represent the actual loss of the person who is awarded the damages. However, except in wrongful death actions brought pursuant to Chapter 2125. of the Revised Code, damages that arise from the same cause of action, transaction or occurrence, or series of transactions or occurrences and that do not represent the actual loss of the person who is awarded the damages shall not exceed two hundred fifty thousand in favor of any one person. * * * "

Defendants contend that the trial court erred in finding, prior to the trial of this matter, that the cap on noneconomic damages set forth in R.C. 2744.05(C)(1) was invalid. In the present case, however, the jury awarded zero dollars in noneconomic damages.

It is well settled that this court does not have the constitutional or statutory authorization to issue advisory opinions. *State ex rel. Park Invest. Co. v. Bd. of Tax Appeals* (1972), 31 Ohio St.2d 183, 185, 60 O.O.2d 127, 128–129, 285 N.E.2d 356, 357. Moreover, constitutional issues are not to be decided unless absolutely necessary. *Hall China Co. v. Public Util. Comm.* (1977), 50 Ohio St.2d 206, 4 O.O.3d 390, 364 N.E.2d 852. See, also, *State ex rel. Williams v. Indus. Comm.* (1927), 116 Ohio St. 45, 56, 156 N.E. 101, 104 ("Unlike some

jurisdictions, we are not empowered to give advisory opinions as to the constitutional validity of laws *if future eventualities should occur.*").

■ We conclude that this court's view regarding the constitutionality of the statute at issue would be purely advisory inasmuch as noneconomic damages were not assessed against the political subdivision. Accordingly, we decline defendant's invitation to rule upon the constitutionality of R.C. 2744.05(C) at this time.

Defendant's first assignment of error on cross-appeal is overruled.

■ Under the second assignment of error on cross-appeal, defendant contends that the trial court erred in excluding the use of a videotape for impeachment purposes. The video at issue was a tape prepared by plaintiffs prior to trial showing Siders engaged in various activities, indicating his range of motion following the accident. Plaintiffs apparently decided not to use the tape at trial.

During trial, prior to the testimony of Siders, counsel for defendant requested that the tape be produced. The trial court ordered the tape to be turned over to the court reporter, and indicated that it would later determine, in the event Siders testified, whether the tape could be used for impeachment purposes.

During the testimony of Siders, defense counsel cross-examined Siders regarding his range of movement. On redirect, plaintiffs' counsel asked Siders to rotate his ankle in front of the jury. Defense counsel then asked the court to view the tape. The court called a recess and, outside the presence of the jury, counsel for the parties and the court viewed the tape. The trial court also asked Siders, out of the view of the jury, to demonstrate his current range of motion for comparison with the tape. The court then ruled that the tape would not be admissible. The record indicates the following exchange:

"The court: Let me see what he can do.

" * * * [Plaintiffs' counsel]: Do your range of motion that you can do on your foot.

" * * * *

"Eric Siders: There is the up. And there is down, and over there and there.

" * * * [Plaintiffs' counsel]: Now, is that impeachment, judge?

"The court: It's not even close to what's on the tape.

" * * * [Plaintiffs' counsel]: It's worse now than it was back then, if anything. Now, is that impeachment?

"The court: We're not going to use it.

" * * * [Plaintiffs' counsel]: Thank you, your honor."

Defendant essentially requests this court to rule, based upon the above record, that the trial court, who, as opposed to this court, had the opportunity to observe Siders's movements, erred in denying admission of the video. We are unable to conclude, based upon the limited record before us, that the trial court abused its discretion in ruling upon the admissibility of the videotape.

Defendant's second assignment of error on cross-appeal is overruled.

Under the third assignment of error on cross-appeal, defendant contends that the trial court erred in not finding plaintiff Siders negligent as a matter of law. Defendant asserts that Siders should be found negligent *per se* for failing to comply with numerous Reynoldsburg city code sections and R.C. 4511.27, a statute dealing with rules for overtaking and passing vehicles.

We initially address defendant's contention that Siders should be found negligent *per se* for failing to have a bell, horn, mirror, light or license. Defendant contended at trial that the lack of these items constituted violations of the Reynoldsburg City Code. Even though the trial court did not find negligence *per se,* defendant was not prejudiced, as the court also concluded that there was a lack of causal connection between the potential violations and the collision. We agree with the court's proximate cause determination. The record does not support the contention that Siders's failure to equip his bicycle with a bell, horn, mirror, light, or to obtain a license for the bicycle, proximately caused the accident.

Defendant further contends that the evidence clearly indicated that Siders was in violation of R.C. 4511.27(B). That statute provides:

"The following rules govern the overtaking and passing of vehicles or trackless trolleys proceeding in the same direction:

" * * *

"(B) Except when overtaking and passing on the right is permitted, the operator of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle at the latter's audible signal, and he shall not increase the speed of his vehicle until completely passed by the overtaking vehicle."

The record indicates that the trial court gave an instruction tracking the language of R.C. 4511.27(B). Specifically, the court charged the jury that "the operator of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle." We further note that the jury was also instructed regarding the operation of a bicycle upon a roadway, left turn signals, and entering the roadway from the berm or shoulder.

Defendant cites cases dealing with the operation of vehicles by a minor in support of the proposition that Siders should be found to be negligent *per se.* We find, however, that the trial court properly instructed the jury regarding the violation of a statute by a minor. Part of the court's instruction to the jury was as follows:

"The conduct of a child is not measured by the same rules that apply to an adult. The measure of care required of the boy is that degree of care which a boy of ordinary care and prudence of the same age, capacity, education and experience is accustomed to exercise for his own safety under the same or similar circumstances."

The above charge is a correct statement of Ohio law. See, *e.g., Michalsky v. Gaertner* (1935), 53 Ohio App. 341, 345, 7 O.O. 140, 141, 5 N.E.2d 181, 183 (minor not chargeable, as a matter of law, with same consequences as to negligence for violation of a statute as an adult); *Wheaton v. Conkle* (1937), 57 Ohio App. 373, 10 O.O. 111, 14 N.E.2d 363 (although children are required to exercise ordinary care to avoid injuries, such care is that degree of care which children of the same age, education and experience, of ordinary care and prudence, are accustomed to exercise under similar circumstances); *Fightmaster v. Mode* (1928), 31 Ohio App. 273, 284, 167 N.E. 407, 411 (in absence of evidence regarding his intelligence, thirteen-year-old plaintiff should be held to that degree of intelligence common to persons of his age and to degree of care which under like circumstances would reasonably be expected from one of his years).

Based upon the foregoing, defendant's third assignment of error on cross-appeal is overruled.

Under the fourth assignment of error on cross-appeal, defendant contends that the trial court erred in denying it political subdivision immunity pursuant to R.C. Chapter 2744.

In accordance with R.C. 2744.02(A)(1), a political subdivision is, in general, "not liable in damages in a civil action for injury * * * to persons * * * allegedly caused by an act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." R.C. 2744.02(B)(1) provides for certain specific exceptions to the general rule of immunity, and states:

"(B) Subject to sections 2744.03 and 2744.05 of the Revised Code, a political subdivision is liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental or proprietary function, as follows:

"(1) Except as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to persons or property caused by the negligent operation of any motor vehicle by their employees upon the public roads, highways, or streets when the employees are engaged within the scope of their employment and authority.  * * *"

Further, R.C. 2744.03 sets forth certain defenses or immunities that a political subdivision may assert regarding acts or omissions not protected under the general rule of immunity.  Defendant contends that the defenses or immunities enumerated under R.C. 2744.03(A)(3) and (5) are applicable to the instant action.

R.C. 2744.03(A)(3) provides:

"The political subdivision is immune from liability if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee."

R.C. 2744.03(A)(5) states:

"The political subdivision is immune from liability if the injury, death, or loss to persons or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources, unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner."

The thrust of defendant's argument is that the decision of defendant regarding the hiring and training of bus drivers, including training drivers as to the proper manner of passing bicycles, falls within the discretion, policymaking or planning powers of the political subdivision.  Defendant also contends that the school bus driver exercised discretion or judgment in operating her school bus.

■ We are unpersuaded.  We note that defendant's brief fails to address the plain language of R.C. 2744.02(B)(1), wherein the legislature specifically provided for liability against a political subdivision for injury "caused by the negligent operation of any motor vehicle by their employees upon the public roads, highways or streets."  We cannot conclude that the legislature intended that the acts at issue, including the operational act of the school bus driver in deciding whether or not to pass the bicycle rider, constitute discretionary acts involving policymaking or planning activities for which immunity is provided.

The fourth assignment of error on cross-appeal is overruled.

■ Under the fifth assignment of error on cross-appeal, defendant asserts that the trial court erred in granting plaintiffs' court costs in their entirety.  In

the present case, the court awarded court costs to plaintiffs in the amount of $4,434.97. Defendant argues that the award included all of plaintiffs' deposition costs and subpoena fees, despite the fact that plaintiffs did not use all of the depositions as evidence at trial.

In *Miller v. Gustus* (1993), 90 Ohio App.3d 622, 624–625, 630 N.E.2d 68, 70, this court discussed the issue of deposition costs, holding:

" * * * [T]he Ohio Supreme Court has stated in *Barrett v. Singer Co.* (1979), 60 Ohio St.2d 7, 8, 14 O.O.3d 122, 122, 396 N.E.2d 218, 219, that 'Ohio case law has formulated the policy that depositions taken *de bene esse,* but not actually used at trial, shall *not* be taxed as a cost of the action.' (Emphasis *sic.*) Thus, Ohio courts have developed the rule that, if depositions are not used as evidence in the trial court, the expense of such depositions should not be included in the costs. See, also, *Shaffer v. Cornwell* (Sept. 19, 1989), Franklin App. No. 89AP–196, unreported, 1989 WL 107558, in which we held that the expense of a discovery deposition that is not 'read' into evidence does not constitute costs."

Plaintiffs acknowledge in their brief that some of the depositions were not "read" into evidence and thus "the court may have erred in taxing these costs against Cross–Appellant."

The record supports defendant's contention that the trial court permitted recovery of court costs for depositions not used at trial. Accordingly, upon remand, "the trial court's determination, necessarily, must be based upon whether the deposition was used (not just filed) in the trial court * * *." *Miller, supra,* 90 Ohio App.3d at 625, 630 N.E.2d at 70.

We also agree with defendant's contention that the costs of playback and the costs of the videotape, as a material, were improperly allowed. See C.P.Sup.R. 12(D)(1); *Friday v. Rice* (1987), 38 Ohio App.3d 113, 526 N.E.2d 1102 (costs of playing videotaped deposition should have been borne by trial court). Further, the record supports defendant's contention that a charge of $460 for editing should not have been allowed in total as the invoice indicates that only $325 of that amount was actually for editing.

To the extent provided above, defendant's fifth assignment of error on cross-appeal is sustained.

Based upon the foregoing, plaintiffs' first, third, fourth, fifth and seventh assignments of error are sustained; plaintiffs' second and sixth assignments of error are overruled; plaintiffs' eighth assignment of error is rendered moot; defendant's first, second, third and fourth assignments of error on cross-appeal are overruled; and defendant's fifth assignment of error on cross-appeal is sustained to the extent provided. The judgment of the trial court is reversed and

this matter is remanded to the trial court for further proceedings in accordance with law and consistent with this opinion.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

PEGGY BRYANT and TYACK, JJ., concur.