OPINION
{¶ 1} Defendant-appellant, William Kovalyk, III, appeals a decision of the Belmont County Common Pleas Court granting plaintiff-appellee, Jessica Armann Yock, a new trial. The central issue of the case is whether the trial court erred in ordering a new trial after a jury found that she was entitled to an award of $5,600.00 for medical bills, but did not award her non-economic damages (i.e., pain and suffering) related to that particular injury.
 {¶ 2} Plaintiff-appellee, Jessica Armann Yock (Yock), was involved in two motor vehicle accidents. The first involved defendant-appellant, William Kovalyk, III (Kovalyk). It occurred on March 19, 2002 (Kovalyk accident). The second involved Robert H. Fink (Fink) and occurred on July 14, 2002 (Fink accident). Yock sued both Kovalyk and Fink alleging she suffered indivisible injuries and damages. Yock settled with Fink and Kovalyk opted to take the case to trial.
 {¶ 3} A jury trial took place on August 11, 2005. Yock testified on her behalf and presented the testimony of her husband, Jason Yock, her mother-in-law, Sarah Yock, and her chiropractor, Shane Bashline, D.C. Kovalyk presented the testimony of his Civ.R. 35 examiner, Joseph Schlonsky, M.D. There was no dispute that Kovalyk caused the accident and that Yock incurred $5,600.00 in medical bills in connection with that accident. On August 11, 2005, the jury awarded Yock $5,600.00 for medical bills and awarded her nothing for non-economic damages.
 {¶ 4} On September 8, 2005, Yock filed a Civ.R. 59(A) motion for a new trial on four different grounds: (1) juror misconduct under Civ.R. 59(A)(2); (2) inadequate damages given under the influence of passion or prejudice under Civ.R. 59(A)(4); (3) jury's verdict concerning non-economic damages not sustained by the weight of the evidence under Civ.R. 59(A)(6); and (4) improper jury instructions under Civ.R. 59(A)(9). Kovalyk opposed the motion, Yock replied, and the matter was heard on December 19, 2005. On December 20, 2005, the trial court denied Yock's motion for a new trial on the first, second, and fourth grounds. However, the court did grant a new trial based on its belief that the jury's verdict concerning damages was not sustained by the weight of the evidence under Civ.R. 54(A)(4). The trial court *Page 2 
reasoned that the jury's award of $5,600.00 for Yock's medical bills associated with the Kovalyk accident could not be reconciled with the uncontroverted testimony that Yock experienced pain and suffering also associated with that accident, for however brief a period of time (i.e., before the Fink accident). This appeal followed.
 {¶ 5} In his appellate brief, Kovalyk raises three assignments of error. They state respectively:
 {¶ 6} "THE TRIAL COURT ERRED IN GRANTING PLAINTIFF-APPELLEE'S MOTION FOR A NEW TRIAL."
 {¶ 7} "THE TRIAL COURT ERRED BY INVADING THE PROVINCE OF THE JURY WHICH FOUND PLAINTIFF'S CLAIMS OF NON-ECONOMIC DAMAGES NOT CREDIBLE WHERE SHE HAD A SECOND CAR WRECK FOUR (4) MONTHS AFTER THE ACCIDENT IN THIS CASE, SUB JUDICE, A SUBSEQUENT SLIP AND FALL ACCIDENT AT WORK, PLUS SHE NEVER MISSED A DAY OF WORK AS THE RESULT OF THE ACCIDENT IN QUESTION AND HAD A PRE-EXISTING CONDITION WHICH COULD CAUSE HER HEADACHE COMPLAINTS."
 {¶ 8} "THE TRIAL COURT ERRED IN GRANTING A NEW TRIAL WHERE SAID VERDICT WAS NOT CORROBORATED BY INTERROGATORIES AS REQUIRED BY CIVIL RULE 49(B), BUT WAS BASED UPON AN IMPROPER SPECIAL VERDICT FORM CONTRARY TO CIVIL RULE 49(C)."
 {¶ 9} Kovalyk then summarizes his argument under these three assignments of error and states that they will be discussed "together in the sake of brevity." (Kovalyk's Brief, p. 6.) The summary states:
 {¶ 10} "THE TRIAL COURT ERRED IN GRANTING PLAINTIFF-APPELLEE'S MOTION FOR NEW TRIAL BY INVADING THE PROVINCE OF THE JURY TO DETERMINE CREDIBILITY AND PROXIMATE CAUSE WHERE THERE WAS A PRE-EXISTING CONGENITAL CONDITION, TWO (2) SUBSEQUENT ACCIDENTS, NO OBJECTIVE CAUSES FOR PLAINTIFF-APPELLEE'S COMPLAINTS AND THE VERDICT WAS NOT TESTED BY INDIVIDUAL INTERROGATORIES BUT WAS BY SPECIAL VERDICT FORM CONTRA TO CIVIL RULE 49(A), (B), AND (C)." *Page 3 
 {¶ 11} A trial court's decision granting a new trial is reviewed for abuse of discretion. Mannion v. Sandel (2001), 91 Ohio St.3d 318, 322,744 N.E.2d 759. "`Abuse of discretion' means unreasonable, arbitrary, or unconscionable." State ex rel. Cranford v. Cleveland,103 Ohio St.3d 196, 2004-Ohio-4884, 814 N.E.2d 1218, ¶ 24.
 {¶ 12} The trial court, when considering a motion for new trial on the manifest weight of the evidence, has a duty to review the evidence submitted at the trial and to pass upon the credibility of the witnesses and the evidence. Rohde v. Farmer (1970), 23 Ohio St.2d 82,262 N.E.2d 685. A trial court is not permitted to grant a new trial merely because it would have decided the case differently. Sims v. Rosenblatt (July 31, 2000), 5th Dist. No. 1999CA00332. Rather, a trial court may grant a new trial only if there is no substantial, credible evidence upon which the jury could have arrived at its verdict. Id., citing Gedetsis v. AnthonyAllega Cement Contractors, Inc. (Sept. 23, 1993), 8th Dist. No. 64954. An appellate court should view the evidence favorably to the trial court's action. Rohde, 23 Ohio St.3d 82.
 {¶ 13} "`[A] reviewing court should view the evidence favorably to the trial court's action rather than to the jury's verdict. The predicate for that rule springs, in part, from the principle that the discretion of the trial judge in granting a new trial may be supported by his having determined from the surrounding circumstances and atmosphere of the trial that the jury's verdict resulted in manifest injustice.'"Mannion v. Sandel (2001), 91 Ohio St.3d 318, 322, 744 N.E.2d 759, quoting Jenkins v. Krieger (1981), 67 Ohio St.2d 314, 320,21 O.O.3d 198, 202, 423 N.E.2d 856, 860.
 {¶ 14} Kovalyk maintains that the jury did consider Yock's claims of non-economic damages and found them not credible and/or proximately caused by the Kovalyk accident. Kovalyk argues that there was no objective cause for Yock's complaints. Kovalyk posits that Yock had a pre-existing congenital condition (arachnoid cyst) which could have contributed to her headaches. Kovalyk also highlights the fact that she was involved in two separate motor vehicle accidents within the span of four months and subsequently suffered a slip and fall at work. *Page 4 
 {¶ 15} Kovalyck also cites two cases from this district in support. Kovalyk cites Schoonover v. Bowen (Jan. 9, 1997), 7th Dist. No. 764, for the proposition that a jury verdict awarding no damages for subjective complaints alleged as a result of soft tissue injuries was not inadequate or against the manifest weight of the evidence.Schoonover is inapposite for two reasons. The first involves the differing procedural posture of the two cases. The plaintiff inSchoonover was denied a new trial. Here, the plaintiff wasgranted a new trial. Because of the standard of review concerning a trial court's ruling on a motion for a new trial, this Court is inclined to leave both decisions (whether granted or denied) undisturbed absent an abuse of discretion. Second, Yock's complaints were not entirely of a subjective nature.
 {¶ 16} Kovalyk cites Wright v. Kurth (Mar. 22, 2000), 7th Dist. No. 97-BA-39, for the proposition that an appellate court should not invade the province of the jury in judging expert testimony. Again, this case is different for the same procedural reason as in Schoonover. The plaintiffs motion for a new trial in Wright was denied. Yock's motion for a new trial here was granted. The present case does not even present this Court the opportunity to invade the province of the jury regarding expert testimony. The expert testimony in this case was not the determinative evidence concerning Yock's alleged non-economic damages.
 {¶ 17} Yock's principal argument is that a verdict awarding no amount for non-economic damages, despite unrefuted evidence of pain and suffering, is not supported by the evidence. Citing Perry v.Whitaker (June 22, 2001), 6th Dist. No. WD-00-065, (verdict awarding medical expenses but not non-economic damages to motorcyclists who were rear-ended by a motor vehicle not supported by the evidence); lames v.Murphy (1995), 106 Ohio App.3d 627, 632, 666 N.E.2d 1147 (award in damages to pedestrian who was injured when he was struck by an automobile, which award was amount identical to pedestrian's medical bills, could not be reconciled with evidence and was set aside);Siders v. Reynoldsburg School Dist. (1994), 99 Ohio App.3d 173, 192,650 N.E.2d 150 (verdict awarding bicyclist no amount for noneconomic damages, despite unrefuted evidence of pain and suffering *Page 5 
from leg injury sustained in collision with school bus, was not supported by the evidence).
 {¶ 18} In this case, there was ample testimony to establish the pain and suffering Yock experienced as a result of and subsequent to the Kovalyk accident. After that accident, she went to Dr. Shane Bashling complaining of headache, neck, shoulder, and arm pain. (Tr. 154.)
 {¶ 19} Concerning the pain she experienced following the March 12, 2002 Kovalyk accident, Yock herself testified:
 {¶ 20} "Q. For the first week after March 19, 2002, can you tell the jury what happened with your condition over the course of that next week?
 {¶ 21} "A. It got worse. It was really painful, like it just kind of set in or something, you know. Like I was really sore. I couldn't turn my neck. I couldn't turn my head to see. I couldn't use my arm to do anything. It was uncomfortable trying to sleep. And you know, hard to work. I mean, I'm left handed. I do everything with my left hand. I don't — there's not anything that I don't do with my left hand. And so that just, you know, puts a damper, whether you're trying to wash clothes or take a shower and wash your hair; and you can't because, you know, it doesn't work right and it hurts if you do it.
 {¶ 22} "Q. Jessica, had you ever felt like that before?
 {¶ 23} "A. No, I've never been injured at all.
 {¶ 24} "Q. Have I ever had any problem with your neck or your back or your arms before?
 {¶ 25} "A. No, no.
 {¶ 26} "Q. As a result of the fact that you felt like you were feeling worse and worse over the course of the next week, what did you do?
 {¶ 27} "A. I went to see Dr. Bashline.
 {¶ 28} "Q, And why did you end up going see Doctor Bashline?
 {¶ 29} "A. I've heard good things. I've known people that have had good experiences from going to the chiropractor and having the kinks and whatnots *Page 6 
worked out. And so that's what I did.
 {¶ 30} "* * *
 {¶ 31} "Q. Tell us how things changed in your life after the wreck of March 19, 2002?
 {¶ 32} "A. I couldn't do any of those things any more. I mean, you can't workout. If you workout, then you're going to, you know, re-aggravate or hurt, or even it will just hurt to just do it anyways. I mean, even, you know, like I said wash my hair hurt. So pretty much we're at a stand-still. And even going to the movies, to sit in a chair for, you know, two hours or whatever, you know, that was uncomfortable and hurt. And you know, you're switching and shifting and getting up to use the restroom so you can take a break. And you know, so we don't do anything. I mean, there's not too much that you can go do.
 {¶ 33} "Q. Jessica, can you tell the jury what the worst part of trying to recover from the March 19, 2002 wreck was?
 {¶ 34} "A. It just was really slow. Took a long time. And having to, you know, re-alter my life and everything that I'm used to doing because of somebody else not paying attention. And so that's really hard to have to go about, you know, my ever day things, and what I'm used to doing. And I'm not used to being restricted and having to, you know, say, "I can't do that," or you can't go skiing with your friends, because skiing hurts. So just having to readjust and redo everything that I'm used to doing was hard." (Tr. 234-235, 243-244.)
 {¶ 35} Yock's husband, Jason Yock testified:
 {¶ 36} "Q. Can you tell us what you remember about the week or so following the wreck; how she was doing, based on what you could see?
 {¶ 37} "A. It was pretty bad. She had migraine headaches. Her shoulder hurt her real bad. She could not — had trouble washing her hair. I had to do dishes, which I never do. And laundry, because she couldn't carry the clothes basket up and down the steps from the basement. So it was pretty bad.
 {¶ 38} "Q. And how long did that situation last, where she was in bad shape *Page 7 
like that?
 {¶ 39} "A. That lasted quite a while.
 {¶ 40} "Q. When you say, "Quite a while," can you tell us what you mean?
 {¶ 41} "A. I would say pretty bad for at least a year. I mean, it started getting a little better. Each visit with Doctor Bashline would get a little better. But I mean, for just a little bit. It just — I don't know how to put it. I mean, she was hurting for a long time, but she was improving." (Tr. 216-217.)
 {¶ 42} Yock's mother-in-law, Sarah Yock, added:
 {¶ 43} "Q. Based on what you observed, how did things change in Jessica's life after that March 19, 2002 car wreck?
 {¶ 44} "A. Well, things were very stressful and bad for her for quite some time. She had just started a new job, or was starting a new job at the Longhorn. She had to worry about transportation. And of course, she was in pain and a lot of migraine headaches at that time. She had trouble even washing her hair, fixing her hair.
 {¶ 45} "Q. Were there some other things you had to help her out with in those first few months following that car wreck?
 {¶ 46} "A. Well, Jason and I both helped. He did dishes and laundry and vacuumed, which was unusual for him. But I was proud that he was helping her. But it was upsetting to see that she couldn't do those things for herself, because she's very independent and likes to do them her way. And so . . .
 {¶ 47} "Q. Based on what you could tell, based on what you could tell from looking at her, was Jessica in pain?
 {¶ 48} "A. Oh, yes.
 {¶ 49} "Q. How could you tell that?
 {¶ 50} "A. There would be lots of times she would cry, you know, that she would have the migraine headaches so bad. And I gave her a thing to put around her neck that you put in the microwave and it supplies heat. And then I bought her a neck massager, with the heat in it. And I would use that on her. And so yes, things *Page 8 
were very difficult for her." (Tr. 268-269.)
 {¶ 51} In sum, the trial court did not abuse its discretion in granting a new trial. While it is true that Yock suffered injuries subsequent to the Kovalyck accident, there is no substantial, credible evidence upon which the jury could have awarded Yock's medical bills, but not award any damages for at least the non-economic damages she incurred in the time period after the Kovalyck accident and before the Fink accident.
 {¶ 52} Lastly, in his brief, Kovalyck argues that the trial court erred by preparing its own verdict form, a "Special Verdict Form," contrary to Civ.R. 49(C). However, at oral argument, Kovalyck's attorney acknowledged that a general verdict form was used, which the record demonstrates was in compliance with Civ.R. 49. Therefore, Kovalyck's argument in that regard is considered withdrawn.
 {¶ 53} Accordingly, Kovalyck's assignments of error are without merit.
 {¶ 54} The judgment of the trial court is hereby affirmed.
Vukovich, J., concurs.
 DeGenaro, P.J., concurs. *Page 1