**UZ ENGINEERED PRODUCTS COMPANY,**
Plaintiff–Appellee and Cross–Appellant,

v.

**MIDWEST MOTOR SUPPLY CO., INC., Defendant–Appellant and Cross–Appellee.***

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 01AP–551.

Decided Dec. 20, 2001.

---

* Reporter's Note:  An appeal to the Supreme Court of Ohio was not allowed in 95 Ohio St.3d 1437, 2002-Ohio-2084, 766 N.E.2d 1002.

384

Reminger & Reminger and Nicholas D. Satullo; William A. Barnett and Jennifer H. Gorman, for appellee.

Ferron & Associates, John W. Ferron, Sloan T. Spaulding and Dawn M. Dunker, for appellant.

PEGGY BRYANT, Presiding Judge.

{¶ 1} Defendant-appellant, Midwest Motor Supply Co., Inc., d.b.a. Kimball-Midwest, appeals from a judgment of the Franklin County Court of Common Pleas awarding plaintiff-appellee, UZ Engineered Products Company, $69,837 in compensatory damages and $30,000 in punitive damages on plaintiff's claim that defendant tortiously interfered with the employment agreements of plaintiff's former employees.

{¶ 2} Plaintiff and defendant are both companies in the maintenance, repair, and operations ("MRO") industry who sell products, composed mostly of small parts, throughout the United States to businesses, institutions, and agencies that perform maintenance for buildings, machinery, equipment, and vehicles. Highly competitive and generating over $160 billion in annual sales, the MRO industry comprises at least ten companies, including plaintiff and defendant, who distribute products on a national basis. It also includes mail order suppliers and other local and national businesses with whom the national companies compete. MRO companies generally sell their products through sales representatives, who make personal calls on active and potential customers and sell the products on a straight commission basis. Plaintiff employs approximately one hundred thirty-five sales representatives, and defendant employs approximately three hundred thirty sales representatives.

{¶ 3} Because the MRO business is competitive and compensation is based solely on commission, the attrition rate of sales employees in the MRO industry is high, with fifty to eighty percent of new hires leaving within the first year of employment. Employees of one MRO company often leave to work for another MRO company. As a result, companies within the MRO industry commonly require their employees to sign employment agreements containing restrictive covenants to protect the company's customer and employee bases. Typical restrictive covenants, at issue here, contain noncompete and nonsolicitation clauses in which an employee agrees that for a specified period of time after the

employee leaves the company, he or she will not solicit business for a competitor or solicit the company's employees to work for a competitor.

{¶ 4} In 1998 and 1999, defendant hired six of plaintiff's employees, including (1) Jeffrey Moore, who worked for plaintiff for eighteen years as a sales manager and was responsible for recruiting, hiring, and training sales representatives, (2) James Grady, who worked for plaintiff for twelve years and was one of plaintiff's top sales representatives when defendant hired him, and (3) Michael McLane, who worked for plaintiff for approximately ten years as a sales representative and area sales manager, during which time he reported to Moore as his supervisor. The three remaining employees defendant hired were Katherine Weber, Michael Greig, and Stanley Boyd, all of whom were sales representatives when they worked for plaintiff.

{¶ 5} Before defendant hired the employees, defendant's management knew that the employees had signed written employment agreements with plaintiff that contained noncompete and nonsolicitation restrictive covenants. Although the precise wording in the employees' agreements differed, each of the noncompete and nonsolicitation clauses was similar in material respects. Specifically, in the noncompete clauses, each employee agreed that for a period of two years following termination of the employee's employment with plaintiff, the employee would refrain from working for a direct or indirect competitor in the same geographic territory in which the employee had worked for plaintiff. In the non-solicitation clauses, the employee agreed that for the same two-year period after the employee left plaintiff's employment, he or she would not solicit plaintiff's other employees to leave their employment with plaintiff.

{¶ 6} Moore was the first of plaintiff's former employees defendant hired. After he began work with defendant, he acknowledged engaging in conversations that he referred to as "recruiting" with some of plaintiff's existing employees, including some of the other individuals defendant subsequently hired from plaintiff. The geographic territories defendant assigned to each of plaintiff's former employees were identical to or substantially overlapped the territories the employees were responsible for while in plaintiff's employment. Moreover, after some of plaintiff's former employees began working for defendant, they solicited some of the same customers they had solicited while employed with plaintiff, despite knowing that they had noncompete agreements with plaintiff. The contacts and solicitations were documented on various reports submitted to defendant.

{¶ 7} Plaintiff sued defendant and its six former employees defendant hired (the "individual defendants"), seeking injunctive relief and compensatory and punitive damages for tortious interference with and violation of the noncompete and nonsolicitation clauses in plaintiff's employment agreements with its former

employees. Plaintiff alleged the violations resulted in loss of customers and employees, loss of business income, and damage to its business reputation and goodwill. Defendant filed a counterclaim seeking a declaratory judgment that plaintiff's employment agreements were overly broad, unreasonable and unenforceable with regard to the geographic and two-year time restrictions, and defendants sought reformation and modification of plaintiff's employment agreements accordingly.

{¶ 8} Before and during trial, plaintiff dismissed its claims against the individual defendants, withdrew its claims for injunctive relief, and withdrew all claims against defendant except a claim for tortious interference with the contracts of Moore, Grady, and McLane, for which plaintiff sought compensatory and punitive damages at trial. At the conclusion of trial, the trial court determined as a matter of law that the restrictive covenants in plaintiff's employment agreements were reasonable and enforceable as written. In its verdict, the jury found that defendant had tortiously interfered with plaintiff's employment agreements and awarded plaintiff $69,837 in compensatory damages and $30,000 in punitive damages.

{¶ 9} Defendant appeals, assigning the following errors:

{¶ 10} "I. The trial court erred to appellants' prejudice by allowing appellee to comment upon before the jury, and introduce into evidence, irrelevant and improper exhibits and testimony including evidence of Kimball–Midwest's own employment agreements and other litigation and settlements, and the court erred in overruling appellants' motion for a mistrial.

{¶ 11} "II. The trial court erred in denying the appellants' motion for directed verdict where appellee failed to establish that its non-compete agreement was reasonable and enforceable.

{¶ 12} "III. The trial court erred in denying appellants' right to a jury trial by declaring that UZ's non–compete agreements with Moore, McLane and Grady were reasonable and enforceable 'as a matter of law.'

{¶ 13} "IV. The trial court erred in refusing to submit to the jury certain of the appellants' proposed interrogatories.

{¶ 14} "V. The jury's damage award against appellant Kimball–Midwest was against the manifest weight of the evidence adduced at trial, and the trial court erred in instructing the jury on the availability of punitive damages.

{¶ 15} "VI. The trial court erred in adopting appellee's proposed findings of fact and conclusions of law and appellee's proposed judgment entry; moreover, the trial court's limited findings and conclusions simply do not support the trial court's judgment as a matter of law."

{¶ 16}   Plaintiff presents a single cross-assignment of error:

{¶ 17}   "The trial court could have properly determined that the restrictive covenants in appellee's employment contracts were enforceable pursuant to the doctrine of estoppel."

■   {¶ 18}   In its first assignment of error, defendant asserts that the trial court erred in allowing plaintiff's counsel to comment in opening statement regarding the restrictive covenants contained in defendant's own employment agreements with the individual defendants.   Defendant argues that it was unfairly prejudiced by those comments that defendant maintains warranted a mistrial, and by the admission of testimonial and documentary evidence regarding defendant's noncompete and nonsolicitation agreements.   Defendant notes that the issue at trial was whether defendant had tortiously interfered with *plaintiff's* employment contracts with Moore, McLane, and Grady, and that defendant's own contracts with those individuals were not in issue and were therefore irrelevant. Defendant contends that it was further prejudiced by irrelevant evidence concerning defendant's previous litigation and settlements with other companies concerning noncompete agreements.

■   {¶ 19}   The parties agree that noncompetition agreements in employment contracts are enforceable only to the extent they (1) are necessary to protect the employer's legitimate interests, (2) do not impose undue hardship on the employee, and (3) are not adverse to the public interest.   *Rogers v. Runfola & Assoc., Inc.* (1991), 57 Ohio St.3d 5, 565 N.E.2d 540; *Raimonde v. Van Vlerah* (1975), 42 Ohio St.2d 21, 71 O.O.2d 12, 325 N.E.2d 544, paragraph two of the syllabus.   See, also, *Brentlinger Enterprises v. Curran* (2001), 141 Ohio App.3d 640, 645–646, 752 N.E.2d 994.   Various factors are considered in whether a noncompete agreement is reasonable, including the agreement's geographic and time limitations.   *Raimonde,* supra, at 25, 71 O.O.2d 12, 325 N.E.2d 544.

{¶ 20}   While defendant acknowledged at trial that noncompete and nonsolicitation clauses were frequently used by companies in the MRO industry, defendant maintained that the territorial restrictions contained in plaintiff's employment agreements were unnecessary and therefore invalid, and the two-year restrictive period was unnecessarily long and therefore unenforceable.   Defendant argued that the only necessary and reasonable restriction was a customer-oriented restriction prohibiting former employees from soliciting their former customers for a period of time less than two years.

{¶ 21}   To rebut defendant's contention that plaintiff's territorial and time restrictions were unreasonable and unenforceable, plaintiff presented evidence of defendant's own employment agreements with its employees as "best evidence" of the type of noncompete and nonsolicitation covenants used, and thus accepted as

reasonable, by the MRO industry generally and defendant specifically. The restrictive covenants in defendant's employment contracts, like those in plaintiff's employment contracts, provided that for a period of two years after an employee of defendant left the company, the employee (1) would not work for a direct or indirect competitor within any geographical area in which the employee had responsibility while employed with defendant, and (2) would not solicit defendant's employees to leave their employment with defendant.

{¶ 22}   The trial court's denial of defendant's motion for mistrial was a matter committed to the sound discretion of the trial court. *State v. Garner* (1995), 74 Ohio St.3d 49, 59, 656 N.E.2d 623.   Similarly, the trial court's decision whether to admit evidence was a discretionary decision that this court may reverse only upon a showing of an abuse of that discretion. *Robinson–Lloyds, Ltd. v. Ohio Dept. of Liquor Control* (1952), 91 Ohio App. 521, 49 O.O. 111, 108 N.E.2d 748.

{¶ 23}   The trial court did not abuse its discretion in denying defendant's motion for mistrial and admitting evidence of the restrictive covenants contained in defendant's own employment agreements.   The evidence was relevant to a determination of the nature and extent of restrictive covenants used by companies in the MRO industry and to a determination of whether such covenants were customarily used and enforced by companies in the industry as "reasonable." See, generally, *Raimonde,* supra.   Specifically, regarding defendant, the evidence was relevant to the credibility of defendant's position at trial that plaintiff's territorial and two-year time restrictions were overly broad, unreasonable, and unenforceable when, as a matter of practice, defendants included the very same territorial and time restrictions in its own employment agreements.   Evidence of defendant's own territorial restrictions in its employment agreements, apparently utilized by defendant for approximately fifteen years, was further admissible in light of a statement made by defendant's counsel in opening argument that a "normal agreement" does not contain a territorial restriction.

{¶ 24}   Regarding the admission of evidence of defendant's previous litigation concerning other companies' noncompete covenants, the court was within its discretion to admit the evidence.   Defendant's president, Patrick McCurdy, repeatedly testified to his belief that territorial restrictions were unenforceable, despite the fact that defendant had such restrictions in its own employment contracts.   McCurdy initially testified that he was unaware of any other company in the industry that enforced territorial limitations in its restrictive covenants.   On cross-examination, however, McCurdy acknowledged that in a previous suit against defendant, defendant had agreed in a settlement that a two-year territorial restriction was reasonable.   Such evidence was relevant and admissible to a determination of (1) whether defendant knew that territorial

limitations in restrictive covenants in employment contracts were valid and enforceable, and (2) whether defendant knew that it was interfering with a valid contract provision and acted with a conscious disregard of plaintiff's contractual rights, providing a basis for an award of punitive damages. See *Digital & Analog Design Corp. v. N. Supply Co.* (1989), 44 Ohio St.3d 36, 43–44, 540 N.E.2d 1358.

{¶ 25} In its first assignment of error, defendant also asserts that the trial court erred to defendant's prejudice in refusing to redact from seven of plaintiff's exhibits the alleged damages for lost business income plaintiff incurred in the territories of former employees Katherine Weber, Michael Greig, and Stanley Boyd. Defendant contends that because plaintiff narrowed its claim at trial to tortious interference with the contracts of Jeffrey Moore, James Grady, and Michael McLane, plaintiff could not pursue damages related to Weber, Greig, and Boyd. Defendant argues that the lost business income figures pertaining to Weber, Greig, and Boyd were irrelevant and should have been stricken from consideration of the jury in its damages award.

{¶ 26} In *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 418–419, 650 N.E.2d 863, the Ohio Supreme Court adopted 4 Restatement of the Law 2d, Torts (1979), Section 766, regarding intentional interference with a contract. Section 766 states that "[t]he cause of action is for pecuniary loss resulting from the interference. Recovery may be had also for consequential harms for which the interference was a legal cause." Id. at Comment t. Consequential damages in a tortious interference action include all damages proximately caused by the defendant's misconduct, including lost profits. *Gray–Jones v. Jones* (2000), 137 Ohio App.3d 93, 102, 738 N.E.2d 64.

{¶ 27} Here, plaintiff presented evidence that after Jeffrey Moore began working for defendant, where he was responsible for employee recruitment and training, he may have induced Weber, Greig, and Boyd to leave plaintiff's employment, in violation of Moore's nonsolicitation agreement with plaintiff. If the jury · believed that Moore, with the knowledge or approval of defendant, improperly solicited those employees to work for defendant in violation of his nonsolicitation agreement with plaintiff, and plaintiff also proved that the employees' departure caused plaintiff to suffer a loss of business income, plaintiff could recover the resulting loss of business income as part of the consequential damages flowing from Moore's violation of his agreement not to solicit plaintiff's employees.

{¶ 28} The admission of exhibits into evidence was within the discretion of the trial court. *Siders v. Reynoldsburg School Dist.* (1994), 99 Ohio App.3d 173, 189, 650 N.E.2d 150. The trial court did not abuse its discretion in refusing to exclude

or redact from the "loss of business income" exhibits the figures for Weber, Greig, and Boyd, where the purported amounts were components of plaintiff's claim for consequential damages.

{¶ 29} Having determined the trial court did not abuse its discretion in the admission of evidence concerning defendant's restrictive covenants and plaintiff's loss of business income, we overrule defendant's first assignment of error.

{¶ 30} Defendant's third assignment of error contends that the trial court erred in deciding as a matter of law whether plaintiff's noncompete agreements with Moore, McLane and Grady were reasonable and enforceable; defendant asserts that the issue should have been submitted to the jury.

{¶ 31} Defendant, however, has waived the argument for appellate purposes. Initially, in its counterclaim, defendant specifically requested that the trial court issue a declaratory judgment finding plaintiff's noncompete agreements to be unreasonable and unenforceable, and asked the court as a matter in equity to modify or reform the territorial and time restrictions in the agreements, all arguably consistent with defendant's request for declaratory relief. However, in its pretrial motion to bifurcate the trial, defendant specifically requested that the trial court, not the jury, determine whether plaintiff's noncompete agreements are valid and enforceable and, if so, the extent to which they are reasonably enforceable. In that same motion, defendant asserted that once the court determined the enforceability issue, the jury was to determine whether the individual defendants breached their noncompete agreements with plaintiff, whether defendant tortiously interfered with such agreements, and the damages, if any, to be awarded to plaintiff. (Defendant's motion to bifurcate.) Moreover, defendant did not object when the trial court advised counsel that it would be instructing the jury that plaintiff's employment agreements were enforceable as a matter of law, and defendant did not object to that instruction when it was given to the jury.

{¶ 32} The invited-error doctrine prohibits a party from taking "advantage of an error which he himself invited or induced." *Hal Artz Lincoln–Mercury, Inc. v. Ford Motor Co.* (1986), 28 Ohio St.3d 20, 28 OBR 83, 502 N.E.2d 590, paragraph one of the syllabus. Because defendant not only failed to object to the action of the trial court now asserted to be error, but also requested it, defendant has waived our consideration of the claimed error.

{¶ 33} Even if defendant's assignment of error is considered, it is without merit. Whether a restrictive covenant in a contract, including a covenant not to compete, is valid and enforceable is an issue for the court to decide. See *Raimonde,* supra; *Runfola,* supra; *Briggs v. Butler* (1942), 140 Ohio St. 499, 45 N.E.2d 757. See, also, *Stark Cty. Milk Producers' Assn. v. Tabeling* (1934), 129

Ohio St. 159, 1 O.O. 472, 194 N.E. 16, paragraph three of syllabus ("Ordinarily the question whether a covenant in a contract in restraint of trade is reasonable under the circumstances and as to subject-matter to which it relates, is one of law for the court"). Defendant's third assignment of error is overruled.

{¶ 34} Defendant's second assignment of error and plaintiff's cross-assignment of error will be discussed together. In its second assignment of error, defendant asserts that the trial court erred in determining that plaintiff's employment contracts were valid and enforceable. Defendant contends that the restriction plaintiff imposed on its former employees against competing in their former sales territories for a period of two years is an unreasonable restraint of trade because the restriction is (1) not necessary to protect plaintiff's legitimate interests, (2) unduly harsh to the employees, and (3) adverse to the public interest. *Runfola*, supra, at 8, 565 N.E.2d 540; *Raimonde*, supra, paragraphs one and two of the syllabus. In its cross-assignment of error, plaintiff contends that because defendant undisputedly requires its employees to execute noncompete agreements that are virtually identical to plaintiff's noncompete agreements, defendant was estopped from claiming that plaintiff's territorial noncompete provisions should be stricken.

{¶ 35} Covenants not to compete will be enforced only to the extent that the restrictions imposed on an employee are reasonably necessary to protect the employer's legitimate business interests. *Raimonde*, supra, paragraph one of the syllabus; *Brentlinger*, supra, at 645, 752 N.E.2d 994. In concluding that plaintiff's employment agreements are enforceable, the trial court determined the time and geographical restrictions in the agreements to be reasonable and appropriate for the type of industry involved. According to the trial court, "[u]nder no circumstances is this agreement unreasonable." The court noted for the record that "it's very difficult for this court to believe that plaintiffs [sic, defendant] should be able to sit here with their own agreements and argue that other people's agreements are invalid and they continue to use their own. But I don't think that's a factor that's supposed to be taken into consideration by me in making that determination."

{¶ 36} Under the somewhat unusual circumstances of this case, the trial court properly could have considered the effect of estoppel in evaluating the reasonableness or enforceability of the noncompete agreements. "In determining the validity of a covenant or agreement in restraint of trade, each case must be decided on its own facts * * *." *Raimonde*, supra, at 25, 71 O.O.2d 12, 325 N.E.2d 544, citing *Extine v. Williamson Midwest* (1964), 176 Ohio St. 403, 27 O.O.2d 375, 200 N.E.2d 297, overruled in part on other grounds in *Raimonde*, supra, paragraph one of the syllabus. The list of factors a court may consider is not limited. See *Raimonde*, supra, quoting *Extine*, supra, at 406, 27 O.O.2d 375,

200 N.E.2d 297 ("*Among the factors* properly to be considered are: '[t]he absence or presence of limitations as to time and space' "). (Emphasis added.)

{¶ 37} Here, although defendant argued at trial that its own two-year territorial restrictions were overly broad and unenforceable, defendant's president acknowledged that defendant, for over fifteen years, used an employment contract for its employees incorporating two-year territorial restrictions virtually identical to the territorial and time restrictions plaintiff imposed. When asked to explain why defendant had not changed its contracts to eliminate the purportedly overbroad provisions, defendant's president stated, "I feel better that we have it in there." Indeed, defendant's president admitted that when defendant enforces its own contracts, it seeks to enforce the two-year restrictions. He further acknowledged that in a lawsuit with another company in the MRO industry, defendant had agreed in the settlement order that a two-year restriction on territory was reasonable. On these facts, the trial court properly could have found defendant estopped from claiming that the two-year territorial restrictions in plaintiff's noncompetition agreements were unreasonable or unenforceable. Nevertheless, we also examine the enforceability of plaintiff's noncompete provision under the test enunciated in *Raimonde.*

{¶ 38} The test articulated in *Raimonde* first requires that the restriction be necessary to protect plaintiff's legitimate business interests. Under more usual circumstances, plaintiff's agreement would appear to be overly broad in precluding plaintiff's former employees from soliciting not only customers they called on while in plaintiff's employment but also all potential customers in the geographic area they worked for plaintiff. Plaintiff, however, demonstrated that it had legitimate business interests sufficient to justify enforcement of its noncompete clauses that prohibited former employees from doing business with, or attempting to do business with, plaintiff's customer base, including all potential customers in a designated geographic area that the former employees had worked while in plaintiff's employment. Defendant presented no evidence to the contrary that suggested prohibiting solicitation of former customers, but allowing competition in the former employee's geographic territory, would adequately protect plaintiff's legitimate business interests.

{¶ 39} An employer has a legitimate interest in limiting not only a former employee's ability to take advantage of personal relationships the employee has developed while representing the employer to the employer's established client, but also in preventing a former employee from using his former employer's customer lists or contacts to solicit new customers. *Runfola,* supra, at 8–9, 565 N.E.2d 540; *Brentlinger,* supra, at 651, 752 N.E.2d 994; *Ruhl v. J.E. Hanger Co., Inc.* (Sept. 8, 1992), Franklin App. No. 92AP–280, 1992 WL 223738. In addition, an employer has a legitimate interest in preventing a former employee

from using the skill, experience, training, and confidential information the former employee has acquired during the employee's tenure with his employer in a manner advantageous to a competitor in attracting business, regardless of whether it was an already established customer of the former employer. *Runfola*, supra; *Ruhl*, supra.

{¶ 40} Here, Moore, Grady, and McLane each had worked for plaintiff for at least ten years and had acquired extensive information regarding plaintiff's products and sales practices, including pricing, that would be advantageous to a competitor in soliciting customers, regardless whether the customers had been former or existing customers of plaintiff or its former employees. Accordingly, plaintiff presented a legitimate interest in imposing time and territorial restrictions to limit its former employees' ability to solicit customers for a competitor. The first element of *Raimonde* weighs in favor of the enforcement of plaintiff's restrictive covenants.

{¶ 41} Under the second *Raimonde* element, the noncompete clause must not impose undue hardship on the employee. Although defendant argued in the trial court that the territorial restrictions were unreasonable and unenforceable, little, if any, evidence was presented that enforcement of the two-year territorial restriction would cause plaintiff's former employees to suffer undue hardship. Neither Moore, Grady, nor McLane testified that his employment options would be severely limited if the restriction were enforced. Cf. *Procter & Gamble Co. v. Stoneham* (2000), 140 Ohio App.3d 260, 747 N.E.2d 268 (finding a three-year noncompete agreement with a worldwide restriction to be valid and enforceable). Because of the lack of evidence in this case on this element, we cannot conclude that enforcement of the noncompete clause necessarily would cause undue hardship to plaintiff's former employees.

{¶ 42} The third element in *Raimonde* provides that a covenant restraining an employee from competing with his former employer upon termination of employment is reasonable and enforceable if it is not injurious to the public. The third element is primarily concerned with the public's interest in promoting fair business competition. *Brentlinger*, supra, at 653, 752 N.E.2d 994. Because the MRO industry is highly competitive, with at least ten national companies in addition to various local and chain competitors, enforcement of plaintiff's noncompete clauses likely would not adversely affect business competition in the MRO industry or harm the public. See *Robert W. Clark, M.D., Inc. v. Mt. Carmel Health* (1997), 124 Ohio App.3d 308, 319–320, 706 N.E.2d 336 (finding enforcement of a noncompete clause which required a hospital to close its sleep disorder center for a two-year period was not harmful to the public where there were twelve other sleep disorder centers in the same metropolitan area); *Brentlinger*, supra, at 653, 752 N.E.2d 994 (finding enforcement of noncompete clause

of one automobile dealer would not significantly affect the advantage to the public or competition among dealers where six other automobile dealers were in operation). Thus, the third element weighs in favor of enforcement of plaintiff's noncompete clauses.

{¶ 43} Accordingly, the evidence in the record does not demonstrate that plaintiff's former employees will suffer undue hardship or that unfair competition between businesses in the MRO industry will result, if plaintiff's two-year territorial noncompete covenants in its employment contracts are enforced. The trial court did not err in concluding that the noncompete covenants are reasonable and enforceable as written, given the circumstances of this case. Plaintiff's cross-assignment of error is sustained, and defendant's second assignment of error is overruled.

{¶ 44} Because defendant's first three assignments of error are without merit, defendant's sixth assignment of error is similarly overruled, where defendant relies solely on its first three assignments of error to advance its assertion that inadequate factual and legal support existed for the trial court's determination that plaintiff's employment contracts were reasonable and enforceable.

{¶ 45} In its fourth assignment of error, defendant asserts that the trial court erred in refusing to submit to the jury nine of defendant's twelve proposed special jury interrogatories concerning the issue of compensatory damages.

{¶ 46} At trial, the court submitted interrogatories to the jury directing the jury to determine separately for Moore, McLane, and Grady whether defendant tortiously interfered with their employment contracts with plaintiff, and the court directed the jury to determine as a collective matter whether plaintiff was entitled to punitive damages. In addition, the court submitted four interrogatories to the jury concerning compensatory damages: (1) whether plaintiff proved it had incurred compensatory damages as a proximate cause of defendant's tortious interference with plaintiff's employment contract with Moore, McLane and/or Grady, (2) what amount, if any, of compensatory damages plaintiff proved was proximately caused by defendant's tortious interference with the contracts, (3) whether defendant proved that plaintiff failed to mitigate its damages, and (4) if so, what amount of damages plaintiff failed to mitigate should be deducted from its compensatory damages. The trial court refused to submit to the jury defendant's proposed, more detailed interrogatories that would have directed the jury to separately determine the damages for each of the three employment contracts with which plaintiff contended defendant had tortiously interfered.

{¶ 47} On appeal, defendant asserts that the trial court had a mandatory duty, on defendant's timely request, to submit the interrogatories to the jury

where the interrogatories were allegedly clear, concerned determinative issues, and were consistent with the trial court's instructions.

{¶ 48}   Civ.R. 49(B) provides:

{¶ 49}   "The court shall submit written interrogatories to the jury * * * upon request of any party prior to the commencement of argument.  * * * The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form that the court approves.  The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law."

{¶ 50}   A trial court does not have a mandatory duty to submit written interrogatories to the jury that a party has requested.  *Ziegler v. Wendel Poultry Serv., Inc.* (1993), 67 Ohio St.3d 10, 14–15, 615 N.E.2d 1022.   Rather, a trial court retains discretion to reject proposed interrogatories that are ambiguous, redundant, or legally objectionable.   Id. at 15, 615 N.E.2d 1022.   "The essential purpose to be served by interrogatories is to test the correctness of a general verdict by eliciting from the jury its assessment of the determinative issues presented by a given controversy in the context of evidence presented at trial."   *Cincinnati Riverfront Coliseum, Inc. v. McNulty Co.* (1986), 28 Ohio St.3d 333, 336–337, 28 OBR 400, 504 N.E.2d 415.   See, also, *Ziegler,* supra; *Joseph v. Ohio Power Co.* (1988), 46 Ohio App.3d 170, 173, 546 N.E.2d 970 (concluding that only interrogatories dispositive of determinative or ultimate issues must be submitted by the trial court).   Determinative issues are "ultimate issues" that when decided will settle the controversy between the parties. *Ziegler,* supra, at 15, 615 N.E.2d 1022; *Miller v. McAllister* (1959), 169 Ohio St. 487, 494, 8 O.O.2d 485, 160 N.E.2d 231.

{¶ 51}   Defendant's proposed interrogatories did not address ultimate or determinative issues.   The relevant ultimate or determinative issue was the "amount," if any, of consequential damages plaintiff suffered due to tortious interference with its employment contracts.   See *Ziegler,* supra, at 15, 615 N.E.2d 1022 (concluding that the determinative issue is "the amount of damages").   Defendant, in effect, sought to have the jury "itemize" the damages for each employment contract with which defendant tortiously interfered.   Such itemizations are not determinative, id., and would not test the ultimate verdict in this case regarding the appropriateness of an award of consequential damages.

{¶ 52}   Further, defendant's corporation was the only remaining defendant when the case went to the jury for deliberations, the individual defendants having been dismissed from the case.   Thus, with regard to liability, the amount of damages plaintiff suffered on any individual employment contract was irrelevant because defendant was solely liable for all of the damages the jury awarded;

apportionment or an itemization of the damages was unnecessary. Accordingly, the trial court did not abuse its discretion in refusing to submit the proposed interrogatories to the jury, and defendant's fourth assignment of error is overruled.

{¶ 53} In its fifth assignment of error, defendant asserts that the jury's award of compensatory damages in the amount of $69,837 and its award of punitive damages in the amount of $30,000 were against the manifest weight of the evidence. Specifically, defendant contends that plaintiff did not prove that it incurred lost sales of $69,837 due to its sales representatives leaving plaintiff's employment to work for defendant, as opposed to some other reason. Defendant further contends that plaintiff's evidence of malice was insufficient to support either an instruction on punitive damages or an award of punitive damages.

{¶ 54} Pursuant to 4 Restatement of the Law 2d, Torts (1979), Section 766, adopted in *Kenty*, supra, at 419, 650 N.E.2d 863, the elements of the tort of intentional interference with contract are "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." Ohio law recognizes that a plaintiff may recover all damages proximately caused by an actor's misconduct in a tortious interference action. *Gray–Jones*, supra, at 102, 738 N.E.2d 64; *Brookeside Ambulance, Inc. v. Walker Ambulance Serv.* (1996), 112 Ohio App.3d 150, 157–158, 678 N.E.2d 248.

{¶ 55} Such damages include lost profits, reduced by the expenditures saved by not having to produce that profit, if both the existence of the loss and the dollar amount of the loss are proven to a reasonable certainty. *Digital & Analog Design*, supra, at 40, 540 N.E.2d 1358. Lost profit damages are measured by the loss, including lost profits the plaintiff business sustained as a result of the tortious interference, not by its effect upon the defendant's business. *Developers Three v. Nationwide Ins. Co.* (1990), 64 Ohio App.3d 794, 803, 582 N.E.2d 1130. A plaintiff may not merely assert that it would have made a particular amount of profits, but must prove lost profits with calculations based on facts. *Gahanna v. Eastgate Properties* (1988), 36 Ohio St.3d 65, 68, 521 N.E.2d 814; *Brookeside*, supra, at 158, 678 N.E.2d 248. An expert may rely upon facts derived from the facts in evidence or from his own investigation. Evid.R. 703; *Brookeside*, supra.

{¶ 56} At trial, plaintiff called John Burke, an independent economist, to testify regarding damages plaintiff incurred due to defendant's allegedly tortious conduct. Using plaintiff's financial statements, Burke calculated the past and future business losses attributable to each of the employees who left

plaintiff's employment to work for defendant, and he then totaled the figures to determine the total loss of business income.

{¶ 57} With regard to the loss of past business income, Burke testified that he looked at the value of the sales by plaintiff's five sales representatives, excluding Moore, made to customers in their respective sales territories while the sales representatives were employed with plaintiff, and then compared those values with the sales values for each territory after the sales representatives left plaintiff's employment to work for defendant. The resulting figure was determined to be the gross loss amount. From the gross loss amount, Burke deducted the variable costs associated with producing the sales, including wages, taxes and costs of goods sold. The final figure was the purported net loss to plaintiff. Burke testified to a reasonable degree of financial certainty plaintiff incurred a total of $171,116 in past business losses through the year 2000.

{¶ 58} As to future business losses, Burke testified that he performed a regression analysis on plaintiff's financial statements and calculated to a reasonable degree of financial certainty that plaintiff would incur $671,863 in damages beginning in 2001 and continuing over a five-year period. Loss of future profits may be recovered as part of a claim of compensatory damages in an action for tortious interference with contract. See, e.g., *Premix, Inc. v. Zappitelli* (N.D.Ohio, 1983), 561 F.Supp. 269, 278 (award of two years' future lost profits upheld). Burke determined plaintiff's total business losses to be approximately $843,000, which did not include any value for loss of customer goodwill.

{¶ 59} Robert Rainey, director of plaintiff's operations and a certified public accountant, also analyzed plaintiff's financial records and calculated the loss of sales to plaintiff attributable to defendant's tortious conduct. The analytical method Rainey used was similar to that Burke used. Rainey opined that Burke's assessment of damages was certain but was low because Burke did not include approximately $46,000 in customer goodwill which Rainey calculated plaintiff had lost. According to Rainey, plaintiff's business losses to a reasonable degree of financial certainty were at least $889,000. He testified that the cause of plaintiff's sales decline was defendant's conduct of encouraging plaintiff's ex-employees to breach their contract with plaintiff (1) by soliciting plaintiff's other employees to terminate their employment with plaintiff (breach of nonsolicitation clauses), and (2) by selling for defendant in their old territories (breach of noncompete clauses). Rainey stated that the sales drop-off was dramatic in the territories of the employees who went to work for defendant but, in comparison, sales in territories for employees who left without violating the covenants in their contracts stayed active with little loss of sales.

{¶ 60}  An appellate court will not reverse a judgment as against the weight of the evidence if competent, credible evidence supports the judgment. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.  Burke's and Rainey's methods and opinions constituted competent, credible evidence of the amount of compensatory damages plaintiff suffered due to defendant's tortious conduct, and the evidence amply supported the jury's award of compensatory damages of $69,837.

{¶ 61}  Moreover, plaintiff presented sufficient evidence to support an instruction on and an award of punitive damages.  A trial court may instruct on punitive damages only if plaintiff proves "actual malice," defined as either "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." (Emphasis sic.)  *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus; see, also, *Digital & Analog Design,* supra, at 43–44, 540 N.E.2d 1358; *Developers Three,* supra, at 805, 582 N.E.2d 1130.

{¶ 62}  Plaintiff presented evidence to establish that defendant knew of and consciously disregarded plaintiff's rights under plaintiff's employment contracts, and defendant knew its interference with plaintiff's contractual rights would cause substantial harm to plaintiff.  Specifically, Patrick McCurdy, defendant's president, acknowledged that an employee who goes to work for a direct competitor within two years can cause harm to the former employer.  Acknowledging the importance of business agreements, he testified that when defendant enforces its own contracts, it seeks to enforce its two-year restrictions.  Indeed, McCurdy acknowledged that defendant had previously agreed in a settlement order that a two-year restriction on territory is reasonable.  Moreover, McCurdy admitted that, despite knowing that plaintiff's employment contracts restricted its employees for a period of two years after termination from calling on *any* companies within their sales territory, defendant consciously ignored the territorial restrictions and allowed, and in fact assigned, plaintiff's former employees to work in their old territories and to call on any company within their respective territory, as long as it was not a former customer.  Other evidence showed that plaintiff's former employees, hired by defendant, solicited some of their former customers as well as other companies within their old sales territories, and defendant had knowledge of the solicitations.

{¶ 63}  Defendant's knowledge, coupled with its actions in connection with plaintiff's former employees, demonstrates a conscious disregard for plaintiff's rights.  Moreover, given defendant's own experience with its identical noncompetition and nonsolicitation agreements, defendant knew of the probability of causing plaintiff substantial harm.  Because sufficient evidence was presented of

defendant's malice, the trial court did not err in instructing the jury on punitive damages, nor did the jury incorrectly assess punitive damages against defendant. Defendant's fifth assignment of error is overruled.

{¶ 64}   Having overruled defendant's six assignments of error, and having sustained plaintiff's cross-assignment of error, we affirm the judgment of the trial court.

Judgment affirmed.

McCORMAC and LAZARUS, JJ., concur.

JOHN W. McCORMAC, J., retired, of the Tenth Appellate District, was assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.