[Cite as *Total Quality Logistics, L.L.C. v. BBI Logistics, L.LC.*, 2024-Ohio-2597.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

|  |  |  |  |
|---|---|---|---|
| TOTAL QUALITY LOGISTICS, LLC, | : | | |
| Appellee and Cross-Appellant, | : | CASE NO. CA2023-11-076 | |
| | : | O P I N I O N | |
| - vs - | | 7/8/2024 | |
| | : | | |
| BBI LOGISTICS LLC, et al., | : | | |
| Appellants and Cross-Appellees. | : | | |

CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2019-CVH-00699

Dinsmore & Shohl LLP, and Eric K. Combs, for appellee and cross-appellant.

Brennan, Manna & Diamond LLC, and David M. Scott and Krista D. Warren, for appellants and cross-appellees.


**S. POWELL, P.J.**

{¶ 1}  Defendants, BBI Logistics, LLC ("BBI") and Benjamin Humphries, appeal the decision of the Clermont County Court of Common Pleas denying them attorneys' fees.  In turn, plaintiff, Total Quality Logistics, LLC ("TQL"), cross-appeals the trial court's judgment in favor of BBI and Humphries.  For the reasons stated below, we affirm in part and reverse in part the judgment of the trial court.

**{¶ 2}** TQL is a freight broker and third-party logistics company headquartered in Clermont County, Ohio. As a third-party logistics company, TQL does not own its own trucks or trailers, but facilitates shipments through those means for other carriers. To that end, TQL offers several transportation services in the freight industry, including highway drive end solutions, refrigerated services, and flatbed services.

**{¶ 3}** Benjamin Humphries was hired by TQL in 2009 as a Logistics Account Executive Trainee ("LAET"). At that time, Humphries signed an Employee Non-Compete, Confidentiality and Non-Solicitation Agreement (the "2009 NCA"). Under the 2009 NCA, Humphries agreed, that for one year after the termination of his employment with TQL, he would neither hold employment with a business competing with TQL nor solicit business from any TQL customer. These are commonly referred to as noncompetition and nonsolicitation provisions.

**{¶ 4}** Over the years he was employed by TQL, Humphries advanced through the ranks, becoming a Logistics Account Executive ("LAE") and later a Sales Team Leader ("STL") before being promoted to a Branch Team Leader ("BTL") in March 2016. As a BTL, Humphries was privy to some confidential information that was not available to him as a LAET, LAE, and STL. During his time at TQL, Humphries also assisted in the creation of a Columbus office for TQL and was described as one of its "founding members." Humpries' main client while working at TQL was Pilot Freight Services ("Pilot"), and he served as the primary contact between Pilot and TQL for arranging business between the companies.

**{¶ 5}** On May 4, 2017, approximately 14 months after Humphries assumed his position as a BTL, he signed a new Employee Non-Compete, Confidentiality and Non-Solicitation Agreement (the "2017 NCA"). The 2017 NCA was similar to the 2009 NCA, except its noncompetition and nonsolicitation provisions applied for period of two years

after Humphries terminated employment with TQL. The 2017 NCA also contained a trade secrets clause pursuant to which Humphries agreed not to disclose or use for the benefit of any third party TQL's trade secrets, including customer lists, carrier lists, load management system, and private processes. The trade secrets clause contained no time limit or term.

{¶ 6} Typically, TQL's new BTLs sign the two-year noncompete immediately. While the delay in Humphries signing of the 2017 NCA was initially attributed to being an administrative oversight, it was testified to at trial that the delay was attributed to the fact that Humphries was not able to enroll in TQL's Long-Term Incentive ("LTI") program upon being promoted to a BTL. The LTI program operated as "phantom stock" that entitled select TQL employees who held it to extra money depending on the company's performance. Despite this delay, there is no dispute among the parties that the 2017 NCA was signed and supported by adequate consideration. The issue, discussed further below, is whether the restrictions in that agreement were reasonable and enforceable under Ohio law.

{¶ 7} In early April 2018, Humphries voluntarily took a demotion to a Senior Logistics Accounts Executive ("SLAE"). At that point, Humphries believed he was only subject to a one-year noncompete, as other SLAEs were. Later that month on April 27, 2018, Humphries resigned from TQL entirely. In the year following his resignation, Humphries did some work in excavation and for his in-laws' company, assisted family with their children, traveled, and "[took] a year and disconnect[ed] and kind of reprioritized[d] what was important in life" after working for TQL for nearly ten years.

{¶ 8} On April 23, 2019, Humphries texted Brent Bosse. Bosse is a high school friend and former coworker of Humphries at TQL who left the company to form BBI, now a competitor of TQL in the freight logistics industry in Columbus. In these texts,

- 3 -

Humphries noted that it had nearly been one year since Humphries left TQL and that he was "chomping at the bit" to begin working for BBI. The two discussed his onboarding with BBI and the likelihood that TQL would file suit to enforce the 2017 NCA. Various communications in the record demonstrate that BBI and Humphries were aware of the stated restrictions under the 2017 NCA prior to the time Humphries commenced employment with BBI. In fact, counsel for BBI and TQL exchanged letters in April of 2019. BBI asserted that Humphries was not subject to 2017 NCA while TQL insisted he was.

{¶ 9} Nonetheless, in May 2019, Humphries began employment with BBI. He signed a two-year noncompete with them, as all BBI employees do. The language of the agreement BBI uses is nearly verbatim to the 2017 NCA. In his first month at BBI, Humphries entered into thirteen transactions with Pilot and made $40,000 from those transactions.

{¶ 10} TQL filed a complaint on May 30, 2019, and alleged four causes of action: (1) breach of the 2017 NCA's noncompete, nonsolicitation, and confidentiality provisions (against Humphries); (2) misappropriation of trade secrets pursuant to R.C. 1333.61 (against Humphries); (3) tortious interference with contract (against BBI); and (4) tortious interference with business relations (against BBI). TQL's complaint sought to enjoin Humphries from violating the 2017 NCA, including working for or consulting with BBI and enjoining BBI from further tortious interference with TQL's contractual or business relations by hiring or continuing to employ former TQL employees.

{¶ 11} TQL also sought a preliminary injunction against BBI and Humphries. A preliminary injunction hearing was held on September 26, 2019. With its Decision and Entry of January 9, 2020, the trial court denied TQL's motion for a preliminary injunction.

{¶ 12} The matter continued for years until a two-day bench trial commenced on July 17, 2023. The trial evidence revealed that Humphries had access to substantial

confidential information prior to his promotion to a BTL and while subject to one-year noncompetition and nonsolicitation provisions. Once promoted to the BTL position, Humphries received more corporate training and became privy to additional confidential information. It is unclear from the record what exactly the scope of that information was beyond customer contact information. Representatives from TQL also conceded that TQL's confidential information changes and loses value over time due to various factors such as market conditions. They also acknowledged that TQL conducts no evaluations of exactly how long its information retains its value and must remain protected.

{¶ 13} By Decision and Final Judgment Entry of October 11, 2023, the trial court found that TQL had failed to establish the necessity of a two-year restriction on Humphries' employment in the third-party freight logistics industry and dismissed with prejudice TQL's breach of contract claim against Humphries. In ruling in favor of Humphries on TQL's breach of contract claim, the trial court focused on the value and life of the confidential information Humphries accessed at TQL. The trial court found that in the highly competitive third-party freight logistics industry, information becomes obsolete quickly due to changing market conditions and carrier performance. The trial court noted that while Humphries was privy to a slightly broader scope of TQL's customers and business operations as a BTL than as a LAE or STL, no evidence was presented as to exactly what that additional information was. In addition, the trial court observed that TQL had not evaluated how long its confidential information retains its value.

{¶ 14} The trial court also relied upon the fact that TQL had not required Humphries to sign the 2017 NCA, increasing the noncompete period from one year to two years, until 14 months after his promotion to BTL. Based upon the delay in having Humphries sign the 2017 NCA, the trial court discounted the validity of TQL's claims that a two-year NCA was necessary to protect its legitimate business interests.

- 5 -

{¶ 15} The trial court also found that enforcing the 2017 NCA on Humphries would create hardship on Humphries because he "would be prohibited from obtaining employment in the industry he had worked in for nearly a decade for two years anywhere in the Continental United States." Such a restriction would, in the view of the trial court, effectively prohibit Humphries use of "his own innate skills and intelligence . . ."

{¶ 16} The trial court concluded "the 2017 NCA, and more particularly, the two-year restrictive covenant provision . . . is not a valid and binding contractual provision as and between TQL and [Humphries]. Accordingly, TQL has failed to sustain its burden that BH breached the 2017 NCA."

{¶ 17} Having determined that TQL had failed to prove its breach of contract claim against Humphries, the trial court also dismissed TQL's other claims with prejudice, finding those other claims derivative of the breach of contract claim.

{¶ 18} The trial court's judgment was silent as to any award of attorneys' fees.

{¶ 19} All parties involved now appeal that judgment.

{¶ 20} BBI'S FIRST ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED IN DENYING BBI AND HUMPHRIES ATTORNEY'S FEES BECAUSE BBI AND HUMPHRIES ARE ENTITLED TO ATTORNEY'S FEES PURSUANT TO R.C. 1333.64.

{¶ 21} BBI and Humphries argue that the trial court erred in failing to award them attorney fees pursuant to R.C. 1333.64(A). That statute provides that, "[t[he court may award reasonable attorney's fees to the prevailing party, if . . . [a] claim of misappropriation is made in bad faith." BBI and Humphries argue TQL's misappropriation of trade secrets was made in bad faith because TQL failed "to present any evidence that any trade secret existed that would necessitate protection under a two-year restriction."

{¶ 22} First, we note TQL never asserted a misappropriation claim against BBI. Thus, even assuming there was bad faith in the underlying claim, BBI had no right to

- 6 -

recover attorneys' fees under R.C. 1333.64(A). As to Humphries, the trial court made no finding that TQL brought or prosecuted its claims in bad faith. In fact, the court did not consider the claim at all. There is thus no finding for us to review.

{¶ 23} Ultimately, just because TQL's misappropriation claim against Humphries was dismissed without even having to consider it on the merits does not establish TQL acted in bad faith. We therefore overrule BBI's and Humphries' sole assignment of error.

{¶ 24} [TQL's] FIRST ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED IN FINDING FOR HUMPHRIES ON TQL'S BREACH OF CONTRACT CLAIM.

{¶ 25} TQL contends that the trial court erred in dismissing its breach of contract claim against Humphries for two primary reasons. First, TQL argues the trial court failed to address Humphries' purported breach of his confidentiality obligation under the 2017 NCA which required him to not disclose to a third party or to use for his own benefit any of TQL's confidential information and trade secrets, including contact information for TQL customers. Second, TQL argues the trial court erred in (a) concluding the two-year term of the 2017 NCA's noncompete and nonsolicitation provisions were unreasonable and (b) failed to properly evaluate TQL's legitimate business interests in retaining long term, highly productive employees.

{¶ 26} We will address TQL's first argument swiftly and succinctly. We agree that the trial court did not specifically address whether Humphries breached the confidentiality provision of the 2017 NCA. Instead, the trial court's judgment hinged on whether the two-year term of the noncompetition and nonsolicitation provisions were enforceable. After finding the two-year term unreasonable, the trial court found no breach of contract at all. However, the confidentiality provision of the agreement was a separate obligation under the 2017 NCA that was not time limited. While many of the trial court's factual findings stated in the judgment may be relevant to whether Humphries violated the confidentiality

- 7 -

provision of the 2017 NDA, we believe express findings on this issue (as well as others, discussed below) should be made on remand.

**{¶ 27}** Turning to the enforceability of the two-year term of the noncompete and nonsolicitation provisions, we have previously held that "the issue of whether a noncompete contract is enforceable is a question of law for the court to decide." *Total Quality Logistics, LLC v. Leonard*, 2023-Ohio-2271, ¶ 25 (12th Dist.), citing *Facility Servs. & Sys., Inc. v. Vaiden*, 2006-Ohio-2895, ¶ 36 (8th Dist.); *see also Chicago Title Ins. Corp. v. Magnuson,* 487 F.3d 985, 990 (6th Cir. 2006), citing *UZ Engineered Products Co. v. Midwest Motor Supply Co.*, 147 Ohio App.3d 382, 394 (10th Dist. 2001). Construction of a contract, including a noncompete agreement, "does not become a question of fact simply because a court must consider facts or evidence." *Id.* at ¶ 24. Questions of law are reviewed de novo. *Batsche v. Batsche*, 2024-Ohio-1234, ¶ 41 (12th Dist.).

**{¶ 28}** Though "cautiously considered and carefully scrutinized," Ohio courts have long recognized the validity of noncompete agreements. *Lake Land Emp. Group of Akron, LLC v. Columber*, 2004-Ohio-786, ¶ 7-9. The quintessential case in Ohio as to the enforceability of NCA agreements is *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 25 (1975). In that case, the Ohio Supreme Court held that restraints in NCAs must be "reasonable." *Id.* "A noncompete agreement is reasonable if: (1) its restrictions are not greater than that which is required to protect the employer, (2) it does not impose an undue hardship on the employee, and (3) it is not injurious to the public." *AK Steel Corp. v. ArcelorMittal USA, L.L.C.*, 2016-Ohio-3285, ¶ 11 (12th Dist.), citing *Raimonde* at paragraph two of the syllabus.

**{¶ 29}** An employer's legitimate interests in utilizing a noncompete agreement include "prevent[ing] the disclosure of a former employer's trade secrets or the use of the former employer's proprietary customer information to solicit the former employer's

customers . . . [and the] retention of employees in which an employer has invested time and other resources." *Leonard* at ¶ 27, citing *Brentlinger Enterprises v. Curran*, 141 Ohio App.3d 640 (10th Dist. 2001), *Total Quality Logistics, L.L.C. v. Alliance Shippers*, Inc., 2021-Ohio-781, ¶ 107 (12th Dist.). These interests stem from a desire to limit unfair competition should an employee leave to work for a competitor. *Id.*

{¶ 30} Stated differently, employers have a legitimate interest limiting "a former employee's ability to take advantage of personal relationships the employee has developed while representing the employer to the employer's established client, [and] also in preventing a former employee from using his former employer's customer lists or contacts to solicit new customers." *UZ Engineered Products Co.*, 147 Ohio App.3d at 396, citing *Rogers v. Runfola & Assoc., Inc.*, 57 Ohio St.3d 5, 8-9 (1991). Citing such concerns, we have previously concluded that:

> noncompete agreements are commonplace in the logistics field, and due to the competitive nature of the industry, such agreements are vital in protecting the interests of companies, like TQL, who elect to hire and extensively train new employees with no prior experience in the field. Thus, . . . TQL ha[s] a legitimate interest in restricting [employees] from immediately transitioning to [a competitor] providing [the competitor] with an unfair advantage . . .

*Alliance Shippers* at ¶ 108.

{¶ 31} Despite an employer's interests, enforcement of a noncompete agreement cannot cause undue hardship on a former employee. "To be sure, any person who is prevented from practicing his profession or trade for a period of time in an area in which it has been practiced, suffers some hardship. However, the *Raimonde* test requires more than just some hardship . . ." *AK Steel Corp.*, 2016-Ohio-3285 at ¶ 19, quoting *Wall v. Firelands Radiology, Inc.,* 106 Ohio App.3d 313, 333 (6th Dist. 1995), *Robert W. Clark, M.D., Inc. v. Mt. Carmel Health*, 124 Ohio App.3d 308, 315 (10th Dist. 1997).

{¶ 32} The public's interest in determining the reasonableness of a noncompete "is primarily concerned with . . . promoting fair business competition." *UZ Engineered Products Co.* at 397. In highly competitive industries, enforcement of noncompete agreements are often found to not adversely affect the industry and limit the public's options in obtaining goods and services. *Id.*

{¶ 33} In *Raimonde*, the Supreme Court identified many factors to consider when weighing these respective interests:

> [1] (t)he absence or presence of limitations as to time and space, . . . [2] whether the employee represents the sole contact with the customer; [3] whether the employee is possessed with confidential information or trade secrets; [4] whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; [5] whether the covenant seeks to stifle the inherent skill and experience of the employee; [6] whether the benefit to the employer is disproportional to the detriment to the employee; [7] whether the covenant operates as a bar to the employee's sole means of support; [8] whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and [9] whether the forbidden employment is merely incidental to the main employment.

*Raimonde*, 42 Ohio St.2d at 25. The "useful life" of trade secrets and confidential information the employee possessed is another factor that can influence the reasonableness of a noncompete agreement. *Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 271 (1st Dist. 2000). Importantly the party seeking enforcement of a covenant not to compete "is required to adduce clear and convincing evidence as to each of [the *Raimonde*] factors . . ." *Levine v. Beckman*, 48 Ohio App.3d 24, 27, (10th Dist. 1988). "In determining the validity of a covenant or agreement in restraint of trade, each case must be decided on its own facts." *Raimonde* at 25, quoting *Extine v. Williamson Midwest, Inc.*, 176 Ohio St. 403 (1964), overruled on other grounds by *Raimonde.*

{¶ 34} Here, no one contests that Humphries possessed confidential information

- 10 -

and trade secrets of TQL (factor one, favoring TQL), but the trial court largely focused its attention on the longevity of the confidential information Humphries possessed, the purported hardship Humphries would endure if subject to a two-year noncompete, and the delay between his acceptance of the BTL position and signing the 2017 NCA. Upon review, there are several issues with the trial court's analysis and its application of the *Raimonde* factors.

{¶ 35} Most notably, the trial court ignored TQL's legitimate interests in having a two-year noncompete applied to an employee of Humphries stature within TQL. No one contests that, over the course of nearly ten years, TQL provided Humphries with extensive training, access to customer data, and other proprietary information. Before working at TQL, Humphries had no experience in the logistics industry. Nonetheless, TQL repeatedly rewarded Humphries' success at the company over the years with promotions and more responsibility. TQL's faith in Humphries was so great that he was a "founding member" of its Columbus office. All of this speaks to the eighth *Raimonde* factor and supports the two-year noncompetition and nonsolicitation provisions.

{¶ 36} In addition, while Humphries may not have served as the sole contact for TQL's clients, he was the primary contact between them. In fact, Humphries had built such a strong business relationship with one of TQL's clients, Pilot, that in Humphries' first month with BBI, he contracted over $40,000 in services with them. The second factor favors TQL as well.

{¶ 37} Finally, while the trial court is correct that the public interest is served by robust competition between companies, TQL still has an interest in preventing *unfair* competition. All parties to this case agree that the freight logistics industry is highly competitive and that companies use noncompete agreements to protect their trade secrets and prevent poaching of their employees and clients. TQL's customer information

may very well have grown stale in the year that Humphries sat out from third-party freight logistics industry. However, when Humphries resigned, he did not simply forget everything he had learned from TQL, the business contacts he gained, and his obligations to TQL under the 2017 NCA.[1] Indeed, the good will Humphries established with customer contacts that he built while employed with TQL retained value to the tune of immediate transactions between Pilot and BBI when Humphries began to work again.

{¶ 38} Thus, as Humphries' tenure with TQL increased, so did TQL's interest in retaining Humphries as an employee. BBI clearly has a similar concern and interest with its employees because BBI uses a noncompete agreement with a two-year noncompetition and nonsolicitation provision that is all but a facsimile to the 2017 NCA.[2] The fourth *Raimonde* factor also favors TQL and the two-year term of the NCA.

{¶ 39} The record also does not support the trial court's conclusion that enforcement of the two-year noncompetition agreement would cause hardship, much less undue hardship, on Humphries. In fact, in the year between working for TQL and BBI, Humphries spent much of his time traveling, visiting family, and reflecting on his time at TQL. Nothing in the record supports the notion that the 2017 NCA operated as a bar to Humphries' sole means of support (factor seven), that his inherent skills or experiences were stifled (factor five), or that he even pursued any meaningful employment, regardless of whether it was forbidden under the NCA, before entering a similar role with BBI (factor nine). These considerations also favor TQL.

---

1. At oral argument, the court likened the situation to the 1997 movie, "Men in Black" and Agent K's ability to flash a pen-like device into someone's eyes to make them forget recent events. For better or worse, such technology is not available, so the business sector instead crafted noncompete agreements in an attempt to reach the same effect.

2. TQL argues that we, like the Tenth District, should hold that "the trial court properly could have found [BBI] estopped from claiming that the two-year territorial restrictions in [TQL's] noncompetition agreements were unreasonable or unenforceable" as BBI utilized the same restrictions. *UZ Engineered Products Co.*, 147 Ohio App.3d at 395. While that assertion may make sense on its face, that legal question is not before us, and we do not decide it here.

- 12 -

{¶ 40} Like the trial court, we too question the delay between Humphries accepting the BTL position and signing the 2017 NCA as Humphries was privy to additional information and responsibility from day one. However, that delay, at least in part, was prompted by Humphries not being able opt in to TQL's LTI "phantom stock" program. This program, available only to select employees, further demonstrates Humphries' value to TQL, its interest in retaining him, and its interest preventing him from working for a competitor in a shorter timeframe should he leave TQL.

{¶ 41} In conclusion, we find the facts of this case applied to the *Raimonde* factors support the reasonableness of the 2017 NCA's two-year noncompete and nonsolicitation provisions. Even assuming the trial court correctly found the "confidential information" provided by TQL to Humphries did not have a useful life of beyond one year, the trial court ignored or misapplied many of the other *Raimonde* factors that favored TQL and the enforcement of noncompetition and nonsolicitation provisions for two years. Therefore, we must remand this case for further proceedings to squarely address TQL's breach of contract claims.

{¶ 42} This assignment of error is sustained.

{¶ 43} [TQL'S] SECOND ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED IN FINDING FOR HUMPHRIES ON TQL'S TRADE SECRET CLAIM.

{¶ 44} As previously stated, the trial court dismissed TQL's trade secret against Humphries as "derivative" of the breach of contract claim, which the trial court found TQL failed to prove because the two-year term of the 2017 NCA's noncompetition and nonsolicitation provisions were not enforceable. TQL argues that this is in error and that its misappropriation of trade secrets claim was based upon R.C. 1333.61 and not its breach of contract claim against Humphries.

{¶ 45} R.C. 1333.61(D) definition of "trade secrets" includes:

> any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following: (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

The elements of a misappropriation of trade secrets claim are: "(1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *TomaydoTomahhdo L.L.C. v. Vozary*, 2017-Ohio-4292, ¶ 9 (8th Dist.); *Tilr Corp. v. TalentNow, LLC*, 2023-Ohio-1345, ¶ 21 (1st Dist.), quoting *Vozary*.

{¶ 46} Put simply, the trial court was wrong in characterizing the misappropriation of trade secrets claim as entirely derivative of the breach of contract claim as TQL asserted in its complaint that the claim was based upon R.C. 1333.61. While many of the trial court's findings regarding the enforceability of the 2017 NCA may apply to TQL's misappropriation of trade secrets claim, we conclude that it is best for the trial court to directly analyze TQL's claims under Ohio statute and caselaw with the understanding that the 2017 NCA was enforceable.

{¶ 47} This assignment of error is also sustained.

{¶ 48} [TQL'S] THIRD ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED IN FINDING FOR BBI ON TQL'S TORT CLAIMS.

{¶ 49} TQL also argues that the trial court's dismissal of its intentional interference with contract and intentional interference with business relations claims as derivative of its breach of contract claim was in error because they are independent causes of action. Tortious interference with a contract or business relations requires: "(1) a business relationship or contract; (2) the wrongdoer's knowledge of the relationship or contract; (3)

- 14 -

the wrongdoer's intentional and improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; (4) a lack of privilege; and (5) resulting damages." *Castle Hill Holdings, LLC v. Al Hut, Inc.*, 2006-Ohio-1353, ¶ 46 (8th Dist.). Importantly, the tort encompasses interference with both current or prospective contractual relationships. *Id. See also A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14 (1995), *Brakefire, Inc. v. Overbeck*, 2007–Ohio–6464, at ¶ 50.

**{¶ 50}** The trial court was correct that the tortious interference with contract and business relations claims are at least related, if not entirely derivative of TQL's breach of contract claim against Humphries. After all, if Humphries is not in breach of the 2017 NCA, BBI cannot be found to have intentionally interfered with the 2017 NCA or improperly soliciting business from companies Humphries used to service at TQL. As a result, because we conclude the trial court erred in analyzing the reasonableness of the 2017 NCA, TQL's tort claims must be determined on their merits. Further proceedings and findings are thus required to determine if BBI intentionally interfered with Humphries' compliance with the 2017 NCA and with TQL's business relations with its clients, such as Pilot.

**{¶ 51}** This assignment of error is also sustained.

**{¶ 52}** Judgment affirmed in part, reversed in part, and remanded.

HENDRICKSON and M. POWELL, JJ., concur.